**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MADELINE KANE, ET AL, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-06476 |
| LOYOLA UNIVERSITY CHICAGO | Honorable Mary M. Rowland |
| Defendant. | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

1.      Ten (10) current and former university students bring this action against Loyola University Chicago ("Loyola" or "University") for: (1) violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"); (2) violations of the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/20; (3) negligence; (4) negligent training/supervision/retention; (5) gross negligence; (6) negligent infliction of emotional distress; (7) intentional infliction of emotional distress; (8) breach of contract; (9) breach of fiduciary duty; (10) premises liability; and (11) fraud.

2.      Loyola has systemically mishandled and underreported student complaints of sexual misconduct, contrary to federal and state regulations in addition to its own internal policies and procedures, dating back to at least 2011.

3.      Despite knowledge sexual assault is endemic and Loyola's students are routinely injured, the University has failed, and continues to fail, to take effective preventive measures and has

allowed this dangerous situation to persist and cause harm to students, including Plaintiffs, creating a campus culture of deliberate indifference and tacit acceptance of sexual misconduct.

4.      The University had notice and knowledge *many* serial predators were on Loyola's campus and failed to prevent Plaintiffs and other students from injury.

5.      Title IX, the Illinois Preventing Sexual Violence in Higher Education Act, and Loyola's own policies and procedures were designed to protect students—like Plaintiffs—from being preyed on by known sexual assailants.

6.      Instead, Plaintiffs were forced to either attend their classes in a hostile environment or abandon their education at Loyola.

7.      Plaintiffs' injuries—which include physical pain and suffering, lost tuition monies, lost wages and earning capacity, mental anguish, and past and future medical expenses—were preventable, had the University adhered to its legal obligations and representations made to students and their families about the actions Loyola was undertaking to ensure the University's students were safe.

## **PARTIES**

8.      Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

9.      Plaintiff Catherine Ann Cappello ("Catherine Ann") attended Loyola as a graduate student in 2011; she left the University before finishing her two-year graduate program due to the sexual misconduct, trauma, and hostility she was subjected to while a student at Loyola. Catherine Ann is a citizen of the State of Arizona.

10.     Madeline Kane ("Madeline") is a current Loyola graduate student; she completed her undergraduate studies in May 2022. Madeline is a citizen of the State of Illinois.

11.    Marissa Sepulveda ("Marissa") attended Loyola as an undergraduate student and left the University in May 2022 before finishing her five-year graduate program due to the sexual misconduct, trauma, and hostility she was subjected to while a student at Loyola. Marissa is a resident of the State of California.

12.    Plaintiff Amma Appiagyei-Dankah ("Amma") attended Loyola as an undergraduate student beginning in 2013; Amma was put on academic probation and later expelled from Loyola after she was sexually assaulted by another student and her requests for academic accommodations were denied by the University. Amma is a citizen of the State of California.

13.    Plaintiff Jane Doe C attended Loyola as an undergraduate student beginning in 2013. Plaintiff Jane Doe C is a citizen of the State of Florida.[1]

14.    Plaintiff Jane Doe N attended Loyola as an undergraduate student beginning in 2018. After Jane Doe N was sexually assaulted by a male Loyola student, she transferred to a different university. Jane Doe N is currently finishing her undergraduate studies at another university in Chicago and is a citizen of the State of Illinois.

15.    Plaintiffs Jane Doe A, Jane Doe H, Jane Doe E, and Jane Doe G are current Loyola undergraduate students and citizens of the State of Illinois.

16.    Defendant Loyola University Chicago is a private educational institution with its primary campus in Chicago, Illinois.

17.    Loyola receives federal funding in many forms, including federal student aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"). Loyola is contractually obligated to enforce Title IX in its programs and all University activities.

---

[1] Plaintiffs Jane Doe C, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe E, and Jane Doe G are using "Jane Doe" pseudonyms in this Amended Complaint in place of their real names to protect their privacy given the sensitive nature of the sexual abuse allegations contained herein.

## PROCEDURAL HISTORY

18.     Plaintiffs Madeline Kane, Marissa Sepulveda and Catherine Ann Cappello initially filed this lawsuit on September 21, 2022, in the Circuit Court of Cook County, Illinois.

19.     Loyola removed this case from the Circuit Court of Cook County, Illinois on November 18, 2022. Dkt. # 1. The University then filed a Motion to Dismiss Plaintiffs' case in its entirety, pursuant to Fed. R. Civ. P. 12(b)(6), on December 9, 2022. Dkt. # 12.

20.     On December 19, 2022, Plaintiffs filed Motions to Sever and Remand Plaintiffs' state law claims back to Circuit Court of Cook County Law Division. Dkt # 18-20. As Plaintiffs discuss in their supporting Memorandum of Law, dkt. # 20, whether the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/20, provides Plaintiffs' a private right of action is a case of first impression—which another federal court in Illinois recently declined to exercise supplemental jurisdiction over, for this reason. *See O'Shea v. Augustana Coll.*, 593 F. Supp. 3d 838 (C.D. Ill. 2022).

21.     Plaintiffs now file this Amended Complaint adding seven victims, all current or former Loyola students, as Plaintiffs—Amma Appiagyei, Jane Doe C, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe E, and Jane Doe G. Plaintiffs also state causes of action for negligent infliction of emotional distress; intentional infliction of emotional distress; and breach of contract.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS

### *Title IX (20 U.S.C. § 1681 et seq. (2006))*

22.     Title IX of the Education Amendments Act of 1972 promotes equal opportunity by providing that no person may be subjected to discrimination on the basis of sex under any educational program or activity receiving federal financial assistance.

23. The discrimination prohibited by Title IX includes inequitable treatment of survivors of sexual assault and sexual harassment.

24. Accordingly, universities receiving federal funds are required to respond promptly and effectively to sexual harassment, including sexual violence, that creates a hostile environment.

### *Clery Act (20 U.S.C.A. § 1092(f))*

25. After college freshman Jeanne Clery was raped and murdered in her own campus residence, Congress enacted the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") in 1990.

26. The Clery Act is designed to provide transparency, ongoing communication, and to promote campus safety by ensuring students, employees, parents, and the broader community are well-informed about important public safety and crime prevention matters.

27. Pursuant to the Clery Act, institutions that receive federal funds must disclose accurate and complete crime statistics for incidents that are reported to campus security and local law enforcement as having occurred within the school's so-called "Clery Geography," which includes three general categories:[2]

- **On campus**: Any building or property that an institution owns or controls within a reasonably contiguous area that directly supports or relates to the institution's educational purposes, including residence halls.

- **Non-campus building or property**: Any building or property that is owned or controlled by a recognized student organization—including school-recognized fraternity or sorority houses and events for school clubs that occur off campus.

- **Public property**: All public property within the reasonably contiguous geographic area of the institution that is adjacent to or accessible from a facility the institution owns or controls and that is used for educational purposes.

---

[2] *See* The Handbook for Campus Safety and Security Reporting (2016 Edition), Department of Education (last accessed September 13, 2022), https://www2.ed.gov/admins/lead/safety/handbook.pdf.

28.     The goal of the notification requirement is to protect members of the constituent campus communities by "aid[ing] in the prevention of similar occurrences."[3]

29.     Congress recognized that contemporary campus communities had become increasingly dangerous places.

30.     Furthermore, Congress noted that, in roughly eighty percent of crimes on campus, both the perpetrator and the victim were students.[4]

31.     Even when sexual violence occurs off campus and not in the context of an educational program or activity, a university must process such complaints and consider the effects of the sexual violence when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity.

### Illinois Preventing Sexual Violence in Higher Education Act (110 ILCS 155/1–99)

32.     In 2015, the Illinois Legislature enacted the Illinois Preventing Sexual Violence in Higher Education Act, which, among other requirements, mandates higher education institutions:

- Develop a clear, comprehensive campus sexual violence policy, including detailed incident reporting options and university response guidelines;

- notify student survivors about their rights, including their right to confidentiality, and the protections the university can provide to ensure the student's health and safety, such as obtaining an order of protection, changing class schedules or campus housing, and the availability of medical and counseling services;

- provide a confidential advisor to survivors to help them understand their options and rights, including the options to report the sexual assault and to seek medical and legal assistance;

- have a comprehensive policy to address student allegations of sexual violence, domestic violence, dating violence, and stalking, consistent with federal and state law; and

---

[3] *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 30 (1st Cir. 2007) (quoting 20 U.S.C. § 1092(f)(3)).

[4] *See* Crime Awareness and Campus Security Act of 1990, Pub.L. No. 101–542, § 202, 104 Stat. 2381, 2384 (codified as amended at 20 U.S.C. § 1092(f)).

- respond to a report submitted electronically within 12 hours.[5]

33.     Pursuant to the Act, Loyola is required to publish an annual report, which includes Loyola's Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy"), as well as data and information concerning trainings, prevention programs, reported incidents within Loyola's "Clery Geography," and the outcomes/resolution of formal complaints.

### *Loyola's Internal Policies & Procedures ("Comprehensive Policy")*

34.     In addition to the federal and state regulations described above, Loyola has its own internal policies and procedures once a student reports sexual misconduct, as detailed in the University's Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy").[6]

35.     According to Loyola's Office for Equity & Compliance, Loyola's internal policies and procedures "meet[] or exceed[] the requirements of federal and state civil rights laws and regulations to provide for a prompt, fair, and equitable administrative process."

36.     In relevant part, the University's Comprehensive Policy provides:

- A preponderance of the evidence standard is used to determine whether a respondent is responsible for violating the Comprehensive Policy. This standard requires that the totality of the evidence, considered impartially, must indicate that it is more likely than not that the Comprehensive Policy was violated.

---

[5] *See* Loyola University Chicago, Office for Equity & Compliance, "Illinois Preventing Sexual Violence in Higher Education" (last accessed September 11, 2022), https://www.luc.edu/equity/titleixequitylaws/illinoispreventingsexualviolenceinhighereducationact/.

[6] *See* Loyola University of Chicago Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation, (last accessed September 12, 2022), https://www.luc.edu/media/lucedu/equity/pdfs/LUC%20Comprehensive%20Policy_2022-2023.pdf.

- Complainants *may* be accompanied by one advisor of their choice, provided that the selection of the advisor does not cause an undue delay of the Grievance Process, but the University will not delay meetings or proceedings to accommodate an advisor's availability.

- Complainants *may* request assistance from Loyola in identifying an available advisor, but the University does "not ensure or guarantee the quality or availability of any University-provided advisor."

- An advisor may be any person of the party's choosing, including an attorney; when an advisor is also an attorney, this must be disclosed to the University, and the advisor is limited to a "supportive" and "non-representative role." An attorney of the University's choosing may also attend any proceeding whenever an attorney serving as an advisor is present.

- Upon receiving a report of sexual misconduct, the University may implement a no contact directive; in all cases in which a no contact directive is implemented, the relevant parties will be promptly informed in writing of the conditions, duration, and applicable parameters of the directive.

- The University aims to complete all investigations into students' report of sexual misconduct within six months of receipt of the initial complaint.

- If an alleged violation of sexual misconduct is substantiated, the violating party may be subject to a range of outcomes—including suspension, expulsion, and the University withholding or revoking the assailant's transcript or degree.

37. At the beginning of each academic year, a copy of Loyola's Comprehensive Policy is published and shared with University students, employees, parents, and the broader community. The above excerpts are from Loyola's 2020 Comprehensive Policy, but, upon information and belief, the University's Comprehensive Policy has remained materially the same since 2011.

### Catherine Ann Cappello ("Catherine Ann")

38. Catherine Ann enrolled as a graduate student at Loyola in 2011.

39. In 2012, Catherine Ann was sexually assaulted by one of her classmates, who was also a visiting priest from a foreign country.

40.     When Catherine Ann was sexually assaulted, she did not know of the University's policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual violence and sexual harassment.[7]

41.     When Catherine Ann attempted to file a formal report with the Title IX office, she was precluded from doing so. Loyola administrators informed Catherine Ann no action could be taken against her assailant because he was visiting from another country, and, therefore, not under Loyola's direction and control.

42.     Later that year, Catherine Ann's professors assigned her to work in a small group with her assailant; when Catherine Ann informed her professors she was not comfortable working in a small group with him because he had sexually assaulted and harassed her, Catherine Ann was told the professors did not need "troublemakers" like her—she could either complete the group assignment or take an incomplete in the course; Catherine Ann chose to take an incomplete.

43.     Thereafter, Catherine Ann operated with a heightened sense of fear, anxiety, and stress knowing her assailant continued to be in her classes and on Loyola's campus.

44.     Attending classes in such a hostile environment became too much for Catherine Ann to bear, and she opted to leave Loyola before completing her degree.

45.     As a result of the University's misconduct, Catherine Ann has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and

---

[7] *See Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 981 (N.D. Cal. 2020) ("when [plaintiff] was assaulted, she did not know of the University's alleged policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual harassment. I join those courts that have held that a pre-assault claim under Title IX does not accrue until a plaintiff knows or has reason to know of such a policy of deliberate indifference").

future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Madeline Kane ("Madeline")

46.     Madeline Kane is currently a graduate student at Loyola; Madeline completed her undergraduate studies at Loyola in May 2022. In February 2020, Madeline was sexually assaulted by another student at a party hosted by one of the five student fraternities recognized by Loyola.[8]

47.     Thereafter, Madeline electronically reported the incident to Loyola.

48.     Several days after Madeline submitted a formal grievance, on March 3, 2020, she received an email response from one of Loyola's Assistant Dean of Students and the acting Title IX Deputy Coordinator informing Madeline the University had received the report.

49.     Madeline also informed the fraternity's student leadership about the assault; consequently, the fraternity's leaders apologized to Madeline and informed Madeline a unanimous decision was reached her assailant, who was pledging the fraternity at the time, would not be allowed to join the fraternity.

50.     In contrast to the fraternity's response, and despite overwhelming evidence Madeline proffered—including photos of bruises, texts, receipts, and multiple witnesses—Loyola took months to conduct an investigation and provided Madeline with negligible support throughout the process.

51.     Madeline was not provided a confidential advisor by the University, and she was forced to conduct parts of the investigation herself; Madeline had to decide who Loyola should interview and what evidence the University should collect.

---

[8] *See* Loyola Center for Student Engagement, Recognized Sororities & Fraternities (last accessed September 12, 2022),
https://www.luc.edu/studentengagement/sororityfraternitylife/recognizedsororitiesfraternities/.

52.     The University also allowed Madeline's assailant, along with the one friend he identified with knowledge of the assault, to delay the investigation process by skipping multiple interviews without consequence.

53.     Loyola did not adequately inform Madeline of the resources and support available to her during the duration of the investigation; when Madeline inquired about mental health care and other resources available to her, she was given negligible support from Dean Love and other Loyola administrators, and Madeline was ultimately left to seek out resources and information on her own.

54.     Though Madeline's perpetrator obtained an attorney to advise him, and in contrast to Loyola's Comprehensive Policy, Madeline was informed by the University she could not obtain an attorney during the Title IX investigation.

55.     At one point during the investigation, Loyola also provided Madeline a letter from a lawyer with her assailant's last name threatening to sue Madeline.

56.     In September 2020, Loyola concluded its investigation into Madeline's sexual assault by informing Madeline via email her perpetrator was "not responsible" due to "insufficient evidence."

57.     After the investigation finished, Madeline was drugged at a different fraternity party in April 2021, but she chose not to report the incident to Loyola because the first investigation was flawed and humiliating.

58.     For years, Maddie has operated—and, as a current student, she continues to operate—with a heightened sense of fear, anxiety, and stress knowing there are possible perpetrators in her classes that have not been removed by the University.

59.     As a result of the University's misconduct, Maddie has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and

future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Marissa Sepulveda ("Marissa")

60.     Marissa began her studies at Loyola in 2018; she was accepted to a five-year program and on track to graduate with a bachelor's and master's degree in social work in May 2023.

61.     In February 2019, Marissa was sexually assaulted by a male student inside a Loyola dorm building.

62.     Thereafter, Marissa informed her dorm's R.A. ("R.A."), and a Title IX investigation was initiated.

63.     Despite having actual notice and knowledge that Marissa's assailant violently assaulted Marissa, and he was a serious threat to other students, Loyola's Title IX coordinator and associate dean, Timothy Love ("Dean Love"), allowed Marissa's assailant to remain on campus with unfettered access to other Loyola students.

64.     Marissa's Title IX investigation continued for months, and, in April 2019, Marissa's assailant violently raped another female Loyola student; it was only after this second incident that a police report was filed and the assailant was removed from campus and expelled from the University.

65.     Several months later, in September 2019, Marissa was raped by another Loyola student on the bathroom of a University dorm building.

66.     Akin to Madeline, because Marissa's first Title IX investigation was traumatizing and flawed, Marissa chose not to file a complaint with Loyola's Title IX Office until September 2021.

67.     When Marissa filed a report in September 2021, Marissa was informed by Dean Love and Loyola's administrators that her Title IX investigation would conclude by December 2021.

68. Loyola's Comprehensive Policy provides no contact directives can be issued "request of a complainant, respondent, or other relevant individual, when warranted." It further provides the parties should "promptly informed in writing of the conditions, duration, and applicable parameters," and violation of a no contact directive "may be grounds for additional informal or formal intervention, including disciplinary action."

69. Marissa requested a no contact directive against her assailant, which was granted by Loyola officials.

70. But on at least two different occasions, Marissa's assailant made contact with Marissa and attended quidditch club events he knew Marissa would be present at.

71. Thereafter, Marissa informed Dean Love about these incidents and requested disciplinary action be taken against her assailant.

72. But Dean Love informed Marissa, despite having a no contact directive in place, the University could not require her assailant stop University events Marissa would be present at, but Dean Love would "recommend" her assailant refrain from doing so.

73. In May 2022, over nine months after Marissa made her initial report, Dean Love informed Marissa during the final week of her undergraduate courses that the Title IX investigation had concluded, and Loyola determined her assailant was guilty of: (1) sexual misconduct, (2) non-consensual sexual contact, (3) non-consensual sexual penetration, and (4) dating/domestic violence.

74. Despite this finding, Marissa learned her assailant would be graduating and receiving an undergraduate degree in business administration from Loyola; he would also be able to attend and walk at the University's graduation ceremony.

75.     Thereafter, Marissa protested and obtained over 2,600 signatures of other Loyola students urging the University to prevent Marissa's assailant from receiving a degree from Loyola and to prevent him from attending Loyola's graduation ceremony.

76.     Upon viewing Marissa's petition, a former Loyola student reached out to Marissa via social media to inform Marissa the student had left Loyola because she was also sexually assaulted, but the University failed to act and/or support her—the former Loyola student informed Marissa she had taken a year off from her studies and was now attending a community college.

77.     After Marissa learned her assailant had received his undergraduate degree from Loyola, she appealed this decision and requested the University revoke his degree—which the University lists as a potential consequence for students found guilty of sexual misconduct. Marissa's request the University revoke her assailant's degree, however, was met with silence from Loyola officials and no further action or reprimand was taken against Marissa's assailant.

78.     For years, Marissa was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant, and other possible perpetrators, continued to be in her classes, club events, and on Loyola's campus.

79.     Attending classes in such a hostile environment became too much for Marissa to bear, and she opted to leave Loyola before completing her five-year program.

80.     As a result of the University's misconduct, Marissa has suffered physical, psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

### Amma Appiagyei-Dankah ("Amma")

81.     Amma enrolled as an undergraduate student at Loyola in 2013.

82.     In the Spring semester of 2014, Amma was sexually assaulted by a male Loyola student.

83.     In the aftermath of the sexual assault, Amma feared reporting the incident to law enforcement and feared receiving medical attention due to concern she would incur significant medical expenses and be forced to tell her parents thereafter.

84.     Amma did report the sexual assault to Loyola officials.

85.     Following her report, an article was published by the University without Amma's consent that referenced her sexual assault, causing Amma to feel exposed and embarrassed that information about her sexual assault was publicly available to her peers and student body; Amma does not know which Loyola administrators provided information beyond the Title IX Office without her consent.

86.     After reporting the incident, Amma was moved to a different dorm in the middle of the night, leaving her isolated from friends and her support system at the University. Meanwhile, her assailant was allowed to remain in his dorm without disruption or any consequences.

87.     Despite a no contact directive, Amma recalls seeing her assailant at the University's dining hall, causing further anxiety and stress around her safety.

88.     During the University's Title IX investigation, Amma was required to attend a hearing with a panel and her assailant present. During the hearing, Amma was directed by University officials to reenact and narrate how her assailant sexually assaulted her in front of her assailant and a panel of unfamiliar administrators. Amma recalls this was deeply traumatizing and revictimizing.

89.     Among fellow students, it was known that Amma's assailant had sexually assaulted other women and demonstrated a repeated behavior of unwanted sexual advances, which included forceful and unwanted kissing and touching. On one occasion—which other students were witness to—Amma's assailant made forceful and unwanted sexual advances against another female student while in a Loyola elevator.

90.     After Amma was sexually assaulted, Amma learned she had frequently attended University events with, Ben Holm, who was criminally charged with violently raping an underage girl. Amma frequently saw Holm around campus and at Loyola fraternity parties; many of Amma's close friends attended class and were assigned to work in small group settings with Holm. Upon information and belief, Loyola knew or should have known about Holm's criminal charges, but the University admitted Holm on a golf scholarship and allowed Holm to attend classes at the University; after attending classes for three years at Loyola, Holm pled guilty and was convicted for the aforementioned charges, receiving a ten-year prison sentence.

91.     During Amma's Spring 2014 semester, Amma's assailant was found guilty and expelled from Loyola.

92.     But Amma was also expelled by the University the following summer after being placed on academic probation. Loyola officials failed to provide Amma with academic accommodations after she was sexually assaulted.

93.     After Amma was expelled from Loyola, she began taking classes at community colleges. Amma has had difficulty maintaining steady employment and her mental and physical health has suffered tremendously since she was sexually assaulted at Loyola. Amma has been diagnosed with depression, PTSD, self-harming behaviors, anxiety, and substance abuse.

94.     While a student at Loyola, Amma was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant attended her classes and other perpetrators were also attending classes and extracurricular activities on Loyola's campus.

95.     As a result of the University's misconduct, Amma was not able to obtain her bachelor's degree, which has diminished her earning capacity significantly. Amma has also suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities, past and future

medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### *Jane Doe C*

96.     Jane Doe C enrolled as an undergraduate student at Loyola in 2013.

97.     In 2014, during her sophomore year, Jane Doe C was subjected to multiple acts of domestic violence at the hands of another male Loyola student; many of these incidents of domestic violence occurred on Loyola's campus.

98.     Following her injuries, which were severe and included visible bruises, bleeding, and swelling, Jane Doe C confided to a professor that another Loyola student had injured her and subjected Jane Doe C to repeated acts of dating violence.

99.     The professor informed Jane Doe C that the professor was a mandated reporter and was required to report Jane Doe C's injuries and the acts of sexual violence perpetrated against Jane Doe C to Loyola's Title IX Office; Jane Doe C received no follow-up from any University administrators or the University's Title IX office, however, and Jane Doe C's assailant continued to terrorize and commit violent acts against Jane Doe C.

100.    After one especially bad act of violence was perpetrated against Jane Doe C, Jane Doe C sought the intervention of and made a report to Loyola's Campus Safety officers. Thereafter, both Jane Doe C and Jane Doe C's assailant were brought in for questioning. Jane Doe C recalls Campus Safety told Jane Doe C if she wanted to pursue any action against her assailant, she would need to make a report to the Chicago Police Department and Loyola could take no disciplinary action against Jane Doe C's student, who was also a Loyola student.

101.    Jane Doe C the decision to report her assailant to Chicago police and she declined out of fear.

102.     Having received no guidance from Loyola Campus Safety and fearing retaliation from her assailant, Jane Doe C declined to file a report with the Chicago Police Department.

103.     In another instance, Jane Doe C's assailant bit Jane Doe C's finger so badly Jane Doe C sought medical attention from Loyola's Wellness Center.

104.     Jane Doe C recalls the nurse who attended to her injury inquired how Jane Doe C injured her finger and showed skepticism when Jane Doe C replied she had injured herself while babysitting; but the nurse did not follow up with Jane Doe C thereafter.

105.     Jane Doe C made it known to University administrators that her assailant and his family were calling and messaging Jane Doe C threatening to take action against her if Jane Doe C's assailant received any disciplinary action against him by University officials and/or law enforcement.

106.     Jane Doe C also provided extensive evidence, including photographs of her injuries, to Loyola administrators to show her assailant was violent and a threat to other students on campus.

107.     Despite this, no disciplinary action was taken against Jane Doe C's assailant; he was allowed to remain on Loyola's campus with unfettered access to other students. To date, Jane Doe C remains unsure if the domestic violence perpetuated against her was statistically reported, as required by the Clery Act, and whether a formal Title IX investigation was conducted by the University.

108.     Jane Doe C learned that after she reported the domestic violence perpetuated against Jane Doe C, Jane Doe C's assailant assaulted another student at a basketball game and was suspended from campus for one week; thereafter, Jane Doe C's assailant was allowed to return to campus.

109.     Two years after Jane Doe C reported the domestic violence described herein, Jane Doe C learned her assailant was in the same class as Jane Doe C, which Jane Doe C learned after arriving to the first day of class and confronting her assailant face-to-face.

110.     Jane Doe C reported to Loyola administrators that her assailant was in the same class as Jane Doe C. In response, Jane Doe C was told it was "up to her" whether or not to contact her assailant and request he change his course schedule.

111.     Out of fear of receiving further threats from her assailant and his family, should Jane Doe C be the one to ask him to change his course schedule, Jane Doe C refrained from doing so.

112.     As such, Jane Doe C did not feel safe nor protected at her University.

113.     For years, Jane Doe C was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant, and other possible perpetrators, continued to be in her classes, club events, and on Loyola's campus.

114.     As a result of Loyola's misconduct, Jane Doe C has suffered psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

115.     As a result of the University's misconduct, Jane Doe C has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Jane Doe N

116.     Jane Doe N was enrolled at Loyola University from 2018 to 2019; thereafter, Jane Doe N transferred to another university, where she is enrolled as an undergraduate student to date.

117.     In December 2018, Jane Doe N's Loyola dorm room was burglarized.

118.    After leaving their dorm room for the evening, Jane Doe N and her roommate returned to find the door open and the lock damaged. Jane Doe N's computer and other electronics and items had been stolen from the room.

119.    After reaching out to friends and others living in the same dorm, Jane Doe N learned an unknown male had entered Jane Doe N's dorm room and a number of other rooms in Jane Doe N's dorm claiming it was the "wrong room," upon encountering others present.

120.    Jane Doe N then made a report to Loyola Campus Safety officers and the Chicago Police Department.

121.    The Chicago Police Department investigated the crime but was unable to identify the burglar due to lack of camera footage in Jane Doe N's dorm; despite prior assurances Loyola Campus Safety officers would follow up with Jane Doe N, she never received any follow up information or support, even after making several direct inquiries to Loyola administrators.

122.    Jane Doe N received no support, follow-up, or communication from Loyola regarding the break-in and theft of her items—they were never recovered and Loyola never provided Jane Doe N with any explanation as to what had occurred the evening of the break-in, or what action the University was undertaking to ensure Jane Doe N and her dormmates would be safe in the future.

123.    Though Jane Doe N's computer was stolen—containing all of her coursework—Jane Doe N was not provided with any support from Loyola, which was especially injurious to Jane Doe N in light of her upcoming final exam schedule—the first final exams Jane Doe N would take as an undergraduate student upon the completion of her first semester art Loyola.

124.    Loyola dorms have multiple checkpoints where students are required to show a student ID upon entry; upon information and belief, the individual who broke into Jane Doe N's dorm,

however, was able to surpass these checkpoints without showing ID and obtaining access to residence floors.

125.    As a result of this break in, Jane Doe N no longer felt safe in her dorm room and requested a transfer to a different dorm that was known to have more robust safety measures. The University rejected this request.

126.    In January 2019, approximately one month after her dorm room was broken into, Jane Doe N was sexually assaulted by another Loyola student.

127.    Jane Doe N's plea to Loyola for support and assistance after her dorm room had been burglarized had already gone unaddressed by the University. Moreover, Jane Doe N knew many other Loyola students who had made reports to the University's Title IX Office that not only went unanswered but resulted in further trauma and stress for the victims. Jane Doe N was advised by her female peers not to make a Title IX report because it would only amplify her physical and mental distress and "go nowhere."

128.    Additionally, after making several inquiries, Jane Doe N did not receive clear communication from Loyola regarding how she could—or should—go about filing a report and pursuing an investigation; no resources were made available to Jane Doe N by Loyola administrators, including Tim Love and the University's Title IX Office.

129.    Ultimately, Jane Doe N decided to transfer to remove herself from a university and campus where a culture of deliberate indifference to sexual assault pervaded.

130.    As a result of the University's misconduct, Jane Doe N has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

*Jane Doe H*

131.    Jane Doe H began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

132.    Jane Doe H was assaulted by a Loyola student known to be a serial predator; upon information and belief, this individual sexually assaulted Jane Doe H and four others—five victims in total, all made reports to Loyola administrators.

133.    It took Jane Doe H many months and multiple attempts before the University filed a report and opened an investigation into Jane Doe H's sexual assault, as mandated by Illinois and federal law.

134.    Initially, Jane Doe H reported to her Resident Advisor ("R.A.").

135.    Thereafter, Jane Doe H's Resident Director—who is a fulltime Loyola employee tasked with overseeing all Resident Advisors and students residing in the dorm—called a dorm-wide meeting; in front of Jane Doe H and sixty (60) of Jane Doe H's peers and dormmates the Resident Director demeaned Jane Doe H by referring to her as a "whiny little brat."

136.    Despite being told by Jane Doe H's R.A. a formal Title IX complaint had been made to the University, Jane Doe H received no follow up information or support from Loyola; Jane Doe H would later learn no Title IX case had been initiated.

137.    Throughout the Fall 2019 semester, Jane Doe H was forced to live directly next to her assailant and experienced significant anxiety and fear her assailant would enter her room and attack her again.

138.    Indeed, Jane Doe H was assaulted again by the same assailant in October 2019; this assault was preventable, had Loyola followed its legal obligations per Illinois and federal law.

139.     The day prior to Thanksgiving break, Jane Doe H brought the sexual assault to the attention of a professor; Jane Doe also informed her professor about the lack of University support, the toll the sexual assaults had taken on Jane Doe H's academic performance, willingness to participate in her courses and University activities, and the havoc it had wreaked on Jane Doe H's physical and mental health.

140.     Jane Doe H's professor brought this to the attention of Loyola administrators and learned no formal Title IX grievance had been filed to date. Jane Doe H's professor and peers advised Jane Doe H the University often did not file Title IX grievances until confronted by the "Advocacy Line" ("the Line")—a resource independent of Loyola's Title IX Office and Office of Compliance and Equity; "the Line" was started by Loyola students who found they were not offered any support services or resources by Loyola's Title IX Office and Office of Compliance and Equity.

141.     From there, confusion ensued, as Jane Doe H was forced to call upon multiple resources, including her professor and "the Line," until an official Title IX was filed against this assailant.

142.     After Thanksgiving 2019, Jane Doe H learned her assailant had sexually assaulted four other students.

143.     Without first advising Jane Doe H or any of the other victims, Tim Love gave a statement on the case to a local news outlet during midterms, which was incredibly traumatizing for Jane Doe H causing her further stress, distraction, and significantly impacting Jane Doe H's ability to perform well on her midterm exams.

144.     Loyola also forced Jane Doe H to "testify" against her assailant during final exams, causing Jane Doe H tremendous stress and precluding Jane Doe H to perform to her academic potential.

145.     Jane Doe H often felt the University was intentionally calendaring stressful aspects of the Title IX investigation during pivotal points of Jane Doe's semester and subjecting the victims of

her assailant to the same treatment—i.e., during midterms and final exams—to discourage Jane Doe H and the four other victims to discontinue with their Title investigation and complaints against a serial sexual predator.

146. Despite five victims reporting the same assailant, it took Loyola over a year to complete its investigation and expel this assailant; upon information and belief, Loyola never reported the presence or misconduct of this serial predator to law enforcement.

147. As a result of the University's misconduct, Jane Doe H has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Jane Doe G

148. Jane Doe G began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

149. On approximately November 7, 2019, Jane Doe G was sexually assaulted by the same Loyola student and assailant that Jane Doe H had made multiple attempts to report to University administrations months prior; as such, Jane Doe G's sexual assault was preventable had Loyola followed its legal obligations as prescribed by Illinois and federal law.

150. Soon after Jane Doe G was sexually assaulted, Jane Doe G was notified by her assailant's male roommate that Jane Doe G's assailant had assaulted at least two other female students in the dorm room he shared with the assailant.

151. On November 13, 2019, Jane Doe G reported the incident to the professor of an entry level course Jane Doe G and her assailant were both enrolled in. Jane Doe G expressed she was

24

uncomfortable sitting near her assailant or being in a group with him due to the sexual assault. Jane Doe G's professor was a mandated reporter and filed a Title IX report on Jane Doe G's behalf.

152.    On November 14, 2019, Jane Doe G received confirmation the Title IX report was filed and received by the University. After learning there were multiple other victims, Jane Doe G informed Loyola she wanted to pursue a Title IX investigation.

153.    Jane Doe G was encouraged by the Title IX office to keep her complaint "internal;" Loyola was adamant Jane Doe G did not need to seek resources outside the University because Loyola was "handling it."

154.    Loyola declined to provide Jane Doe G with any resources she was entitled under Illinois and federal law throughout the investigation; when Jane Doe G requested an advocate to support her, University officials were silent.

155.    Later in the investigation, Loyola officials did make it known to Jane Doe G the Title IX Office had received multiple other complaints against Jane Doe G's assailant.

156.    Loyola officials explicitly asked Jane Doe G to refrain from attempting to speak with or contact her assailant's other victims; Jane Doe G was told this would make the University's Title IX investigation "easier" for the University. Jane Doe G was not provided a support advocate and discouraged from speaking with an attorney or law enforcement throughout this process.

157.    Loyola officials requested Jane Doe G meet with them on multiple occasions. During one meeting, Jane Doe G was asked to retell her story and physically "act out" how her assailant had sexually assaulted Jane Doe G. A Loyola administrator requested Jane Doe G "move her body" and "touch herself" in a way to that reenacted the sexual assault for University officials. Jane Doe G felt these requests were not only highly inappropriate but retraumatizing for her.

158.     After Jane Doe G's Title IX report was filed by Jane Doe G's professor, Loyola offcials informed Jane Doe G a "no contact" directive would be enforced against Jane Doe G's assailant. When Jane Doe G learned her assailant was enrolled in one of Jane Doe G's Spring 2020 courses, however, Loyola advised Jane Doe G the University could not "force" her assailant to choose a different course; Loyola officials encouraged Jane Doe G to contact her assailant and request he choose a different course selection. Concerned and confused by this, Jane Doe G communicated this directive to her assigned Title IX investigator; Jane Doe G was informed by the investigator she would "not get in trouble" should Jane Doe G contact her assailant and request her choose a different course selection.

159.     Jane Doe G's assailant refused to modify his class schedule and Jane Doe G was forced to attend class with her assailant for an entire semester and throughout an active Title IX investigation, despite five other victims reporting the same assailant for serious sexual misconduct against them.

160.     Jane Doe G's Title IX hearing was held on March 4, 2020. Jane Doe G contacted the investigator assigned to her case several times over the course of the next month requesting an update. A preliminary report was provided on April 15, 2020, which pertained to Jane Doe G's sexual assault only. The report made available to Jane Doe G included little more than the summary of the initial report made to Jane Doe G's assigned investigator.

161.     Thereafter, Jane Doe G learned at least five other victims had filed Title IX reports against the same assailant; at least four reported they had been sexually assaulted by this assailant before Jane Doe G was sexually assaulted in November 2019. Jane Doe G's sexual assault was preventable.

162.     It was not until July 24, 2020, that Jane Doe G was informed her assailant had been found responsible for sexual misconduct by the University—over nine months after Jane Doe G initially reported to Loyola officials and at least five other victims had also independently reported the same assailant sexually abused them.

163.     If not for Loyola's systemic mishandling and underreporting of sexual misconduct, current students, like Jane Doe G, would not be victim to a campus deliberately indifferent to sexual assault; Jane Doe G's sexual assault was preventable; Title IX and Illinois laws were enacted to keep university students—like Jane Doe G—safe.

164.     As a result of the University's misconduct, Jane Doe G has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

***Jane Doe A***

165.     Jane Doe A began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

166.     In August 2019, during one of Jane Doe A's first weeks as an undergraduate student on Loyola's campus, Jane Doe A was invited to the dorm room of a male sophomore student; Jane Doe A arrived and brought one other female student whom she had just met in her residence hall during Fall 2019 "Welcome Week."

167.     Jane Doe A arrived and brought several other female students that were rushing the same sorority as Jane Doe A.

168.     Prior to arriving, Jane Doe A had consumed one fourth of a can of "Truly" vodka seltzer.

169.    After arriving within the hour, the assailant offered Jane Doe A one shot of Fireball Cinnamon whiskey.

170.    After consuming the Fireball whiskey shot, Jane Doe A felt incapacitated to the point where she told her friend she felt she needed to lay down; Jane Doe A was then led to the assailant's bedroom.

171.    Jane Doe A learned that while she was incapacitated, her assailant had sexually assaulted Jane Doe A in his bed.

172.    Several months later, Jane Doe A reported the sexual assault to Loyola's Title IX Office and provided a number of witnesses and documents to the University.

173.    In February 2020, while Jane Doe A's Title IX investigation was underway, Loyola erroneously shared a document with Jane Doe A that indicated two other female students had reported they too were sexually assaulted by Jane Doe A's assailant.

174.    If not for Loyola's systemic mishandling and underreporting of sexual misconduct, students, like Jane Doe A, would not be one of numerous victims of the same assailant.

175.    As a result of the University's misconduct, Jane Doe A has suffered psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

176.    As a result of the University's misconduct, Jane Doe A has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

***Jane Doe E***

28

177.    Jane Doe E began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

178.    In December 2021, Jane Doe E participated in a study abroad program at one of Loyola's overseas campuses. A male Loyola student was assigned as an R.A. in charge of Jane Doe E and other Loyola students participating in the program.

179.    When Jane Doe E returned to Loyola's residential housing after a "night out" with other Loyola students, Jane Doe E was encouraged by the R.A. to come to his room; once there, Jane Doe E fell asleep and twice throughout the night woke up to the R.A. forcefully attempting to sexually penetrate her.

180.    Jane Doe E made it clear to the R.A. she was sleeping and therefore could not, and did not, consent to his unwanted sexual advances.

181.    When Jane Doe E returned to Loyola's Chicago campus the following semester, she learned the R.A. who had sexually assaulted her was assigned to a freshman dorm—this caused Jane Doe E great concern.

182.    Thereafter, Jane Doe E learned the same R.A. responsible for her assault was also accused by a number of other female Loyola students of sexual assaults, independent of her assault.

183.    When Jane Doe E reported the R.A. responsible for her sexual assault to Loyola administrators, she was met with resistance and told her case would be handled by the Office of Equity and Compliance instead of the Title IX Office because the sexual assault occurred on one of Loyola's international campuses; Jane Doe E was also initially informed the University had not received complaints that any other Loyola students were sexually assaulted by Jane Doe E's assailant.

184.    Though Jane Doe E informed Loyola she was aware her assailant had sexually assaulted other students, Jane Doe E was encouraged not to speak with these victims.

185.    Jane Doe E voiced concern to Loyola administrators upon belief Jane Doe E's assailant remained on campus and Jane Doe E could, therefore, encounter her assailant face-to-face at any point in time. This caused Jane Doe E severe distress and impacted her academically as well.

186.    The University informed Jane Doe E their "hands were tied" until the investigation concluded and also informed Jane Doe E her assailant had the right to remain an R.A. until then.

187.    For months, Jane Doe E lived in fear that her assailant remained on campus with unfettered access to Jane Doe E and other potential victims.

188.    As a result of the University's misconduct, Jane Doe E has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

## OTHER SALIENT FACTS

189.    Plaintiffs are informed, believe, and on that basis allege, Loyola has systemically mishandled student complaints of sexual violence and sexual harassment, contrary to federal and state mandates and its own internal policies and procedures, dating back to at least 2011.

190.    Loyola's student newspaper, *The Phoenix*, has reported:

- In 2016, a female student's sexual assault report was lost by the University, which Dean Love acknowledged and apologized for.

- Dean Love has admitted Loyola has an "internal goal" of responding to reports within one business day—despite the fact Illinois law requires universities to respond within 12 hours.

- Multiple protests have been held, on a near yearly basis, by students demanding Loyola do more to combat violent sex crimes from occurring at the University.

- The University allowed a professor to continue teaching classes after determining several students' reports of his sexual misconduct to be credible.

- After three female students reported they were raped by the same male student on campus in 2018, it took the University five months, despite informing them it would take approximately 60 days, to find the students' allegations to be credible. The University initially sanctioned him by requiring he complete community service and write a paper on the meaning of consent—a gravely disproportional sanction for violently raping three students on campus.

- Students have reported the University's Title IX investigators have made serious errors in witness statements and sent emails with sensitive information to perpetrators versus survivors.

- Loyola found a male student guilty of rape and thereafter expelled and banned him from campus, but still allowed him to participate in his graduation ceremony.

191.    Plaintiffs are informed, believe, and on that basis allege, Loyola has also grossly underreported the number of sexually violent incidents that occurred during the years prior to Plaintiffs' enrollment at the University.

192.    In December 2017, University Security reported the Chicago Police Department had reported 873 violent crimes in Loyola's jurisdiction since 2013, but the University's Campus Safety had only reported 205.[9]

193.    Many of the violent crimes not reported by Campus Safety occurred within less than a five-minute walk from the University's campus, including 89 aggravated assaults and batteries, 94 robberies, 44 crimes with guns, and 29 sex crimes.[10]

194.    According to Loyola's Preventing Violence in Higher Education Annual Report, in 2016:

- 48 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office;

---

[9] "Loyola Campus Safety Reports a Fraction of Crimes Compared to CPD," *The Phoenix* (updated January 31, 2018), (https://loyolaphoenix.com/2017/11/campus-safety-chronically-reports-crime/.

[10] *Id.*

- 66 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource; and

- 68 incidents of "off campus" sexual violence, domestic violence, dating violence, and stalking were reported.[11]

195.     Thus, in total, there were 182 incidents of sexual violence, domestic violence, dating violence, and stalking reported by Loyola students in 2016.[12]

196.     According to Loyola's Preventing Violence in Higher Education Annual Report, in 2017:

- 36 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office; and

- 93 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource.[13]

197.     Loyola did not publish how many incidents occurred "off campus" or at "non-campus buildings or properties" in 2017, or any year thereafter.[14]

198.     Despite 129 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking reported to have occurred in 2017—and an unknown number of off-campus incidents—not a single student was reprimanded by the University in 2017, as shown below:

---

[11] *See* Loyola's 2016 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022):
https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20Univeristy%20Chicago_Annual%20Report%202016.pdf.
[12] *Id.*

[13] *See* Loyola's 2017 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022):
https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20University%20Chicago%202018%20ILPSVHE%20Annual%20Report%20(Submitted%20November%201,%202018).pdf.

[14] *Id.*

Loyola University Chicago                                                      Part B (II) (B)

**PART B (II)(B) Complaint Resolution Procedure Outcomes**

*It should be noted that several cases reported to have occurred outside of "Clery Geography" (i.e. at off-campus parties, apartments, etc.) were addressed through the complaint resolution process. However, given the reporting guidelines which advise to narrowly report only those incidents which occurred within "Clery Geography," these incidents and their related outcomes are not reflected in the data below.

|                     | Found "not responsible" for violation of comprehensive policy | Dismissed/expelled | Suspended | Otherwise disciplined |
|---------------------|---------------------------------------------------------------|--------------------|-----------|-----------------------|
| Sexual violence     | 0*                                                            | 0                  | 0         | 0                     |
| Domestic violence   | 0                                                             | 0                  | 0         | 0                     |
| Dating violence     | 0                                                             | 0                  | 0         | 0                     |
| Stalking            | 0                                                             | 0                  | 0         | 0                     |

199.    The Department of Education Office of Postsecondary Education publishes the most recent three years of a university's self-reported sexual misconduct crime statistics.[15] According, to its website, from 2018 to 2020 Loyola reported:

- In 2018, there were 11 incidents of rape and 9 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2019, there were 7 incidents of rape and 4 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 2 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2020, there were 5 incidents of rape and 3 incidents of fondling reported "on campus;" 1 incident of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 1 incident of fondling was reported on public properties.

---

[15] *See* U.S. Department of Education Office of Postsecondary Education (last accessed September 12, 2022), https://ope.ed.gov/campussafety/#/institution/search.

200. Upon information and belief, the above data grossly underreports the number of violent sexual criminal offenses reported during from 2018 to 2020 within Loyola's Clery Geography, in violation of federal and state regulations in addition to the University's internal policies and procedures.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### DISCRIMINATION ON THE BASIS OF GENDER, PRE- AND POST-ASSAULT
### DELIBERATE INDIFFERENCE, AND ERRONEOUS OUTCOME

201. Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

202. The acts, and failures to act, perpetrated against Plaintiffs amounted to unlawful sexual harassment and discrimination on the basis of gender.

203. Loyola had actual knowledge its policies and procedures, as written and implemented, were enabling acts of sexual violence against its students, including Plaintiffs.

204. The University maintained a *de facto* policy, detailed throughout this Complaint, to suppress reports of sexual violence and sexual harassment, and to support accused campus predators, resulting in a culture of deliberate indifference toward sexual misconduct at Loyola.[16]

---

[16] The Tenth Circuit has concluded that Title IX liability exists "when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007).

*See also Posso v. Niagara Univ.*, No. 19-CV-1293-LJV-MJR, 2020 WL 8771334, at *6 (W.D.N.Y. Nov. 2, 2020), report and recommendation adopted, 518 F. Supp. 3d 688 (W.D.N.Y. 2021) (the Court finds *Simpson* and *Karasek* [cited *supra,* in Footnote 3] persuasive for the premise that a university can certainly be liable under Title IX for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context, and possibly beyond that).

205.    Thus, Loyola's actions evidence an official decision by Dean Love, Loyola's Title IX coordinator, and other high-ranking University officials, not to remedy Loyola's systemic mishandling and underreporting of sexual violence.

206.    In violation of federal and state regulations as well as in violation of Loyola's own policies and procedures, the University failed to provide Plaintiffs with fair, prompt, and equitable proceedings in response to complaints of sexual misconduct.

207.    Plaintiffs were, therefore, subjected to erroneous outcomes: Catherine Ann was erroneously prevented from initiating a Title IX investigation against her assailant; Madeline's assailant was erroneously found not guilty, despite overwhelming evidence surpassing the University's preponderance standard; and Marissa's assailant was erroneously allowed to graduate and received no effective sanction, despite being found guilty of sexual violence.

208.    Following each of Plaintiffs' sexual assaults described above, Dean Love and other high-ranking University administrators became aware of the facts underlying Plaintiffs' injuries.

209.    In spite of that knowledge, Dean Love and other University officials, with authority to take corrective action on Plaintiffs' behalf, had actual notice of said discrimination and failed to adequately respond. Those failures amounted to deliberate indifference toward the unlawful conduct that was occurring and staggering number of incidents of sexual assault and sexual harassment occurring on Loyola's campus and within non-campus properties and buildings—especially fraternity houses.

210.    Loyola's well-documented pattern of discrimination and sexual misconduct against female victims and in favor of male assailants, created an atmosphere on campus that was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of the education and create a sexually hostile environment for Plaintiffs.

211.    The University's response to Catherine Ann, Madeline, and Marissa was so hostile as to compound their injuries, including Catherine Ann and Marissa leaving Loyola altogether, constituting retaliation under Title IX.

212.    Additionally, and/or in the alternative, Loyola failed to enact and/or disseminate and/or implement proper or adequate policies to discover, prohibit or remedy the kind of discrimination that Plaintiffs suffered. This failure included, without limitation, nonexistent and inadequate enforcement policies and procedures for the recognition, reporting, investigation, and correction of unlawful discrimination. Loyola acted with deliberate indifference in deviating significantly from the standard of care it owed Plaintiffs.

213.    As a result of Loyola's discrimination, deliberate indifference, and erroneous outcomes per Title IX, Plaintiffs are entitled to recover their damages and reasonable attorneys' fees and costs of litigation from the University.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE ILLINOIS PREVENTING SEXUAL
## VIOLENCE IN HIGHER EDUCATION ACT[17]

214.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

215.    The University violated Plaintiffs' rights pursuant to the Illinois Preventing Sexual Violence in Higher Education Act.

216.    Based on information and belief, Loyola's Title IX coordinator, Dean Love, and other high-ranking officials, consciously and intentionally underreported the number of sexually violent incidents that occurred "on campus," in "non-campus buildings or properties," and on "public

---

[17] Because the Illinois Preventing Sexual Violence in Higher Education Act was enacted in 2015, this cause of action is brought on behalf of Plaintiffs Madeline Kane and Marissa Sepulveda only.

property" within a reasonably contiguous area of the school, in violation of the Illinois Preventing Sexual Violence in Higher Education's reporting requirements.

217.    Further, Loyola violated the Act by:

- Failing to notify Plaintiffs about the protections the University could provide to ensure their safety, such as obtaining an order of protection, changing class schedules or campus housing, reporting to law enforcement, and the availability of medical and counseling services;

- not responding to Madeline's electronically submitted report within 12 hours; Loyola's Title IX Coordinator, Dean Love, has stated although the University is legally obligated to do so, Loyola has its own internal policy of attempting to respond to survivors' electronically submitted reports within one business day; and

- not conducting a prompt, fair, and equitable investigation into Plaintiffs' grievances.

218.    While there is not an explicit private right of action in 110 ILCS 155/20, there is an implied right of action that can be established under Illinois common law. *See Metzger v. DaRosa*, 209 Ill. 2d 30, 36 (2004).

219.    More specifically, "implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Id.*

220.    Plaintiffs, as female students and sexual assault victims at a place of higher education, are members of the class for whose benefit 110 ILCS 155/20 was enacted, and their injuries are that 110 ILCS 155/20 was designed to prevent.

221.    A private right of action is consistent with the purpose of the statute, which is to prevent sexual violence in institutions of higher education in the state of Illinois—such as Loyola.

222.    Implying a private right of action is necessary to provide an adequate remedy for violations of 110 ILCS 155/20.

223.    As a result of the University's failures and inaction, Plaintiffs have suffered physical damages and mental anguish, among other harms, as a direct and proximate result of Loyola's violations of the Preventing Sexual Violence in Higher Education Act.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

224.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

225.    At all relevant times, Loyola owed Plaintiffs a duty of reasonable care—as set forth by federal and state regulations in addition to the University's internal policies and procedures—to ensure their safety and freedom from sexual assault and sexual harassment by, among other things, conducting an investigation into their claims of sexual misconduct which complied with Title IX, the Clery Act, and the Illinois Preventing Sexual Violence in Higher Education.

226.    Loyola was aware that a staggering number of sexual assaults against its students, including Plaintiffs, were occurring at the University, creating a serious risk of harm of sexual misconduct to all students, including Plaintiffs.

227.    After Plaintiffs were subjected to sexual misconduct, the University took no reasonable protective measures to protect Plaintiffs, nor took action to prevent the recurrence of future incidents of sexual misconduct or remedy the effects of sexual misconduct on Plaintiffs.

228.    Loyola's failure to follow federal and state regulations in additions to its own policies and procedures in reviewing, investigating, reporting, and resolving complaints of sexual assault and sexual harassment constitutes a breach of the duty of care it owed Plaintiffs.

229.    This breach caused harm to Plaintiffs and benefitted the University, which sought to protect its reputation from public knowledge of the rampant sexual misconduct occurring at Loyola.

230. The above acts and omissions were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

231. That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## FOURTH CAUSE OF ACTION
## NEGLIGENT TRAINING/SUPERVISION/RETENTION

232. Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

233. Plaintiffs allege negligent failure to warn, train, or educate by Loyola in its response to reports of sexual misconduct.

234. Plaintiffs allege negligent supervision by Loyola in its response to reports of sexual misconduct. Loyola had a duty to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with Title IX and all applicable federal and state regulations in addition to internal policies and procedures, but they failed to do so and therefore breached the duties of care owed to Plaintiffs as alleged herein.

235. Loyola's failure to timely report, investigate, and respond to the sexual assaults perpetrated against Plaintiffs is a breach of the University's duty to train and supervise its employees.

236. Loyola also breached its duties to Madeline, Marissa, and other similarly situated Loyola students by retaining Dean Love as the University's Title IX coordinator, after he admitted to not following federal and state regulations by losing and failing to promptly respond to student reports of sexual misconduct.

237. These breaches caused harm to Plaintiffs and benefitted the University, which sought to protect its reputation from public knowledge of the rampant sexual misconduct occurring at Loyola.

238.    The above acts and omissions were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

239.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## FIFTH CAUSE OF ACTION
## GROSS NEGLIGENCE

240.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

241.    The University's acts and omissions, as previously described, were committed with reckless disregard for, and with willful, wanton, and conscious indifference to, the rights, safety, and welfare of Loyola's students, including Plaintiffs.

242.    The nature of Loyola's aforesaid wrongful acts and omissions were of such a nature as to constitute gross negligence and malice.

243.    Loyola's Title IX coordinator, Dean Love, and other high-ranking officials breached their duties to Plaintiffs by undertaking a continuous course of action in the form of conscious decisions, with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiffs and other Loyola students to sexual misconduct—in violation of federal and state regulations and the University's own policies and procedures—without exercising slight care or diligence.

244.    These breaches caused harm to Plaintiffs and benefitted the University, which sought to protect its reputation from public knowledge of the rampant sexual misconduct occurring at Loyola.

245.    The above acts and omissions were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

246.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## SIXTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

247.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

248.    At all relevant times, Loyola owed Plaintiffs a duty of reasonable care-as set forth by federal and state regulations in addition to the University's internal policies and procedures-to ensure their safety and freedom from sexual assault and sexual harassment by, among other things, conducting an investigation into their claims of sexual misconduct which complied with Title IX, the Clery Act, and the Illinois Preventing Sexual Violence in Higher Education.

249.    Loyola was aware of the rampant problems related to sexual assaults on campus but failed to act and take reasonable protective measures to ensure students at the University were safe from sexual predators.

250.    Loyola failed to comply with state and federal reporting mandates, the University's policies, and provide Plaintiffs with a reasonably safe forum to report their sexual assaults.

251.    After the Plaintiffs became the victims of sexual assault themselves, Loyola did nothing to remedy the situation, protect the Plaintiffs, or take action to prevent future sexual assaults from the same predators. Defendant's acts and omissions lead to the perpetuation of sexual violence. In return, Plaintiffs became victims when they were not informed sexual assault was endemic to Loyola's campus and became victims of sexual assault themselves.

252.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## SEVENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

253.    Plaintiffs incorporate all paragraphs of the Complaint as if fully set forth herein.

254.    As a result of Loyola's acts and omissions, University administrators' conduct can be categorized as truly extreme and outrageous.

255.    Loyola's administrators and staff were required to be knowledgeable of and adhere to requirements set forth by Title IX, the Clery Act, and the Illinois' Preventing Sexual Violence in Higher Education Act.

256.    When the University failed to follow any of the aforementioned state and federal requirements, they should have reasonably concluded their conduct would inflict emotional damages after Plaintiffs were sexually assaulted.

257.    After the Plaintiffs became victims of sexual assault, University administrators abused their positions of authority when they deemed their actions to be reasonable-though they provided little to no support or remedy to the victims, as a result of the University's misconduct.

258.    As a result of Loyola's actions and omissions, the Plaintiffs have suffered severe emotional distress.

259.    That by reason of the foregoing, Plaintiffs are entitled to recover all their damages from Loyola.

**EIGHTH CAUSE OF ACTION**
**BREACH OF CONTRACT**

260.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

261.    "It is true that a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Uni*., 346 Ill.App.3d 728, 732 (2004).

262.    To state a breach of contract claim, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and

(4) resulting injury to the plaintiff. *Gonzalzles v. American Exp. Credit Corp.*, 315 Ill.App.3d 199, 206 (2000).

263.   At all relevant times, the Plaintiffs maintained a valid and enforceable contractual relationship with Loyola, in which the material terms were generally outlined in the University's catalogs, handbooks, posters, and bulletins.

264.   Plaintiffs, paying consideration via tuition and fees, performed in their contracts with the University by attending the school and taking relevant coursework related to each of the Plaintiffs' respective degrees.

265.   University breached its contract when Loyola:

  (a) failed to perform via adequately disclosing sexual assault statistics for on-campus, non-campus buildings, and adjacent public property mandated under the Clery Act;

  (b) Loyola failed to follow the mandates required by the Illinois Preventing Sexual Violence in Higher Education Act when they developed a "Comprehensive Policy" but failed to perform any of the promises made therein;

  (c) and Loyola failed to provide Plaintiffs a fair, prompt, and equitable proceeding in response to their reports of sexual harassment, as mandated by Title IX.

266.   As a result of the University's failures and inaction, Plaintiffs have suffered physical damages and mental anguish, among other harms, as a direct and proximate result of Loyola's breach of contract and are therefore entitled to a full recovery.

## NINTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

267.   Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

268.     In addition to the common law duty of ordinary care discussed above, and incorporated herein, Loyola had a duty that arose because of, *inter alia*, a special relationship between the University and its students.

269.     Loyola agreed to educate, care for, and keep safe University students in exchange for tuition, for which Loyola accepted in order to find and promote Plaintiffs' and other Loyola students' University courses and other educational experiences and initiatives.

270.     Loyola's Title IX coordinator, Dean Love, and other high-ranking officers breached their duty of care by acting with reckless disregard for the safety and welfare of Plaintiffs and other students by failing to properly investigate, remedy, and take a reasonable course of action to prevent sexual misconduct.

271.     Loyola placed its own reputational interests ahead of the safety of its students, including Plaintiffs.

272.     Dean Love and other high-ranking Loyola administrators breached their fiduciary duties by, among others, hiding and keeping secret the fact that there were known sexual predators on the University's campus to whom Plaintiffs and other students would be subjected to, by failing to disclose reports and crime statistics of sexual misconducted, as required by federal and state regulations; and by failing to disclose the University's culture of deliberate indifference to sexual misconduct, knowledge of endemic sexual assault and sexual harassment, and its policy of fraudulently concealing past incidents of sexual abuse—thereby putting the interest of Loyola ahead of students and victims like Plaintiffs by continuing to this day to hide the full extent of the staggering number of sexual assaults that occur on the University's campus and by Loyola students every year.

273.    These breaches caused harm to Plaintiffs and benefitted the University, which sought to protect its reputation from public knowledge of the rampant sexual misconduct occurring at Loyola.

274.    The above acts and omissions were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

275.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

**TENTH CAUSE OF ACTION**
**PREMISES LIABILITY**

276.    Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

277.    At all relevant times, Loyola owned, operated, and exercised control over the dorm buildings and premises upon which Plaintiffs' sexual assaults occurred.

278.    At all relevant times, Plaintiffs were invitees on the University owned and/or controlled premises where they were assaulted.

279.    Loyola breached its duties to Plaintiffs by providing inadequate security and supervision over the premises, despite the known existence of unreasonable risk of harm from dangerous sexual predators on these premises.

280.    The risk of harm was foreseeable, and the University knew or had reason to know that sexual assaults would occur given previous sexual misconduct, proximity of other incidents of sexual misconduct, the recency of other sexual misconduct, frequency of sexual misconduct, the similarity of other sexual misconduct, and actual notice and knowledge of sexual misconduct by Dean Love and other Loyola administrators.

281.    These breaches caused harm to Plaintiffs and benefitted the University, which sought to protect its reputation from public knowledge of the rampant sexual misconduct occurring at Loyola.

282.    The above acts and omissions were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

283.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## ELEVENTH CAUSE OF ACTION
## FRAUD

284.    Plaintiffs incorporate all paragraphs of this Complaint as if set forth herein.

285.    Loyola, by and though the University's officers and authorized managing agents, committed fraud upon Plaintiffs with respect to their false representations regarding the safety of their facilities, associated programs and students to the pecuniary damage of Plaintiffs.

286.    In order to induce Plaintiffs to enroll at the University and pay tuition, and to induce Plaintiffs to continue their enrollment, attendance at and payment of tuition to the University, Loyola issued statements and made omissions that communicated to Plaintiffs the University was safe and that students only experienced a minimal amount of sexual violence.

287.    Based on information and belief, Loyola consciously and intentionally underreported the number of sexually violent incidents that occurred "on campus," in "non-campus buildings or properties," and on "public property" within a reasonably contiguous area of the school, in violation of the Clery Act's and the Illinois Preventing Sexual Violence in Higher Education's reporting requirements.

288.    Loyola stopped publishing reports of sexual violence that occurred on "non-campus" (i.e. "off campus") buildings and properties, including fraternity and sorority houses, after 2016.

289.    Thus, the statistics reported in Loyola's annual reports were false when made and the University knew them to be false.

290.    The above fraudulent acts and omissions by the University were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiff seek in this suit.

291.    That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Loyola.

## PRAYER FOR RELIEF AND JURY DEMAND

292.    Wherefore, based on the foregoing causes of action, Plaintiffs demand judgment against Loyola in an amount to be determined in a trial by jury; for a sum that will fully and fairly compensate Plaintiffs for their injuries and conscious pain and suffering, that Plaintiffs recover actual damages; that Plaintiffs are entitled to recover compensatory damages; that Plaintiffs recover punitive damages; together with litigation costs, expenses and reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiffs may be justly entitled.

293.    In addition to monetary damages, as current Loyola students, Madeline, Jane Doe A, Jane Doe H, Jane Doe E, and Jane Doe G seek injunctive relief from Loyola, as damages alone are not an adequate remedy for the University's ongoing and continuous violations of federal and state regulations in addition to Loyola's own policies and procedures. Loyola's deliberate indifference to sexual misconduct continues to endanger Loyola students, including Plaintiffs, at present and indefinitely into the future; Dean Love and Loyola's other high-ranking officials know, or reasonably should know, the ongoing and endemic student-on-student sexual assault and sexual harassment has created a hostile environment that pervades to date and will continue unless this

court intervenes. Plaintiffs, therefore, seek a permanent injunction requiring Loyola to ensure the University accurately reports incidents of sexual violence; takes substantial steps to properly and timely investigate reports of discrimination at Loyola; provide appropriate interim measures and reasonable accommodations to complainants, impose appropriate discipline and remedial measures in situations where a violation of Title IX, the Clery Act, the Illinois Preventing Sexual Violence in Higher Education Act, and the University's Comprehensive Policy is found to have occurred; cease all retaliatory action against students who report incidents of sexual misconduct; and impose appropriate discipline and remedial measures, as necessary.

294.    Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Ashley M. Pileika*
Ashley M. Pileika
New York Bar No. 974605
Darren Wolf*
Texas State Bar No. 24072430
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
Tel:  214-346-5355
Fax: 214-346-5909
ashley@darrenwolf.com
darren@darrenwolf.com

Elizabeth A. Fegan
**Fegan Scott LLC**
150 S. Wacker Dr., 24th Floor
Chicago, Illinois 60606
Tel: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

*\*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2023, I electronically transmitted the attached document to the Clerk's Office using the ECF System for e-filing and transmittal of a Notice of Electronic Filing to the ECF registrants on record in this matter.

*/s/ Ashley M. Pileika*
Ashley M. Pileika
