**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Madeline Kane *et al.*, | § | Lead Case No. 22-cv-06476 |
| | § | Related Case Nos.: 23-cv-02772 & 24-cv-08223 |
| Plaintiffs, | § | |
| v. | § | **PLAINTIFFS'** |
| | § | **CONSOLIDATED AMENDED COMPLAINT** |
| Loyola University of Chicago, | § | |
| | § | Hon. Jeremy C. Daniel |
| Defendant. | § | Hon. Heather K. McShain |
| | § | |

---

## INTRODUCTION

1.      Plaintiffs Madeline Kane, Catherine Ann Cappello, Marissa Sepulveda, Amma Appiagyei-Dankah, Jane Doe A, Jane Doe C, Jane Doe H, Jane Doe G, Jane Doe N, Fernanda Araon, Jane Doe B, and Jane Doe M (collectively "Plaintiffs")—all current and former Loyola students when they joined this lawsuit—bring this action against Loyola University Chicago ("Loyola" or "University") for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX") and the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/1–99, ("PSVHEA").

2.      Loyola has systemically mishandled and underreported student complaints of sexual misconduct, contrary to federal and state regulations in addition to its own internal policies and procedures, dating back to at least 2011.

3.      Despite knowledge sexual assault is endemic and Loyola's students are routinely injured, the University has failed, and continues to fail, to take effective preventive measures and has allowed this dangerous situation to persist and cause harm to students, including Plaintiffs, creating a campus culture of deliberate indifference and tacit acceptance of sexual misconduct.

4.      Loyola has shown deliberate indifference to known acts of sexual assault and harassment for at least the past decade.

5.      The University had notice and knowledge a number of serial predators were on Loyola's campus and failed to prevent Plaintiffs and other students from injury—due only to the University's gross negligence and violations of federal and state laws.

6.      Title IX, PSVHEA, and Loyola's own policies and procedures were designed to protect students—like Plaintiffs—from being preyed on by known sexual assailants.

7.      Instead, Plaintiffs were forced to either attend their classes in a hostile environment or abandon their education at Loyola.

8.      Plaintiffs' injuries—which include, among others, physical pain and suffering, lost tuition expenses, lost earning capacity and future wages, mental anguish, and past and future medical expenses—were preventable, had the University adhered to its legal obligations and representations made to students and their families about the actions Loyola was undertaking to ensure the University's students were safe.

## **PARTIES**

9.      Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

10.     Plaintiff Catherine Ann Cappello ("Cappello") attended Loyola as a graduate student in 2011; she left the University before finishing her two-year graduate program due to the sexual misconduct, trauma, and hostility she was subjected to while a student at Loyola. Cappello is a citizen of the State of Arizona.

11.     Madeline Kane ("Kane") was a current Loyola graduated student when she initially filed this lawsuit in September 2022; she completed her undergraduate studies in May 2022. Kane is a citizen of the State of Illinois.

12.     Marissa Sepulveda ("Sepulveda") attended Loyola as an undergraduate student and left the University in May 2022 before finishing her five-year graduate program due to the sexual misconduct, trauma, and hostility she was subjected to while a student at Loyola. Sepulveda is a resident of the State of California.

13.     Plaintiff Amma Appiagyei ("Appiagyei") attended Loyola as an undergraduate student beginning in 2013; Appiagyei was put on academic probation and later expelled from Loyola after she was sexually assaulted by another student and her requests for accommodations were denied by the University. Appiagyei is a citizen of the State of California.

14.     Plaintiff Jane Doe C attended Loyola as an undergraduate student beginning in 2013. Plaintiff Jane Doe C is currently a citizen of the State of Florida.

15.     Plaintiff Jane Doe N attended the Loyola as an undergraduate student beginning in 2018. After Jane Doe N was sexually assaulted by another Loyola student, she transferred to a different university. Jane Doe N is a citizen of the State of Illinois.

16.     Plaintiffs Jane Doe A, Jane Doe H, and Jane Doe G were current Loyola undergraduate students and citizens of the State of Illinois when they were added to this lawsuit in March 2023.

17.     Plaintiff Fernanda Aragon was a current Loyola undergraduate student and citizen of the State of Illinois when she filed suit in May 2023; she began her studies at Loyola in August 2019.

18.     Plaintiffs Jane Doe B and Jane Doe M are former Loyola undergraduate students; they began their studies at Loyola in August 2016. Jane Doe B is a citizen of the State of Illinois. Jane Doe M is a citizen of the State of Maine.

19.     Defendant Loyola University Chicago is a private educational institution with its primary campus in Chicago, Illinois.

20.     Loyola receives federal funding in many forms, including federal student aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"). Loyola is contractually obligated to enforce Title IX in its programs and all University activities.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS

### Title IX (20 U.S.C. § 1681 et seq. (2006))

21.     Title IX of the Education Amendments Act of 1972 promotes equal opportunity by providing that no person may be subjected to discrimination on the basis of sex under any educational program or activity receiving federal financial assistance.

22.     The discrimination prohibited by Title IX includes inequitable treatment of survivors of sexual assault and sexual harassment.

23.     Accordingly, universities receiving federal funds are required to respond promptly and effectively to sexual harassment, including sexual violence, that creates a hostile environment.

### Clery Act (20 U.S.C.A. § 1092(f))

24.     After college freshman Jeanne Clery was raped and murdered in her own campus residence, Congress enacted the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") in 1990.

25.     The Clery Act is designed to provide transparency, ongoing communication, and to promote campus safety by ensuring students, employees, parents, and the broader community are well-informed about important public safety and crime prevention matters.

26.     Pursuant to the Clery Act, institutions that receive federal funds must disclose accurate and complete crime statistics for incidents that are reported to campus security and local law

enforcement as having occurred within the school's so-called "Clery Geography," which includes three general categories:[1]

- <u>On campus</u>: Any building or property that an institution owns or controls within a reasonably contiguous area that directly supports or relates to the institution's educational purposes, including residence halls.

- <u>Non-campus building or property</u>: Any building or property that is owned or controlled by a recognized student organization—including school-recognized fraternity or sorority houses and events for school clubs that occur off campus.

- <u>Public property</u>: All public property within the reasonably contiguous geographic area of the institution that is adjacent to or accessible from a facility the institution owns or controls and that is used for educational purposes.

27.     The goal of the notification requirement is to protect members of the constituent campus communities by "aid[ing] in the prevention of similar occurrences."[2]

28.     Congress recognized that contemporary campus communities had become increasingly dangerous places.

29.     Furthermore, Congress noted that, in roughly eighty percent of crimes on campus, both the perpetrator and the victim were students.[3]

30.     Even when sexual violence occurs off campus and not in the context of an educational program or activity, a university must process such complaints and consider the effects of the

---

[1] *See* The Handbook for Campus Safety and Security Reporting (2016 Edition), Department of Education (last accessed September 13, 2022),
https://www2.ed.gov/admins/lead/safety/handbook.pdf.

[2] *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 30 (1st Cir. 2007) (quoting 20 U.S.C. § 1092(f)(3)).

[3] *See* Crime Awareness and Campus Security Act of 1990, Pub.L. No. 101–542, § 202, 104 Stat. 2381, 2384 (codified as amended at 20 U.S.C. § 1092(f)).

sexual violence when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity.

### *Illinois Preventing Sexual Violence in Higher Education Act (110 ILCS 155/1–99)*

31.     In 2015, the Illinois Legislature enacted the Illinois Preventing Sexual Violence in Higher Education Act ("PSVHEA"), which, among other requirements, mandates higher education institutions:

- Develop a clear, comprehensive campus sexual violence policy, including detailed incident reporting options and university response guidelines;

- notify student survivors about their rights, including their right to confidentiality, and the protections the university can provide to ensure the student's health and safety, such as obtaining an order of protection, changing class schedules or campus housing, and the availability of medical and counseling services;

- provide a confidential advisor to survivors to help them understand their options and rights, including the options to report the sexual assault and to seek medical and legal assistance;

- have a comprehensive policy to address student allegations of sexual violence, domestic violence, dating violence, and stalking, consistent with federal and state law; and

- respond to a report submitted electronically within 12 hours.[4]

32.     Pursuant to the PSVHEA, Loyola is required to publish an annual report, which includes Loyola's Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy"), as well as data and information concerning trainings, prevention programs, reported incidents within Loyola's "Clery Geography," and the outcomes/resolution of formal complaints.

---

[4] *See* Loyola University Chicago, Office for Equity & Compliance, "Illinois Preventing Sexual Violence in Higher Education" (last accessed September 11, 2022), https://www.luc.edu/equity/titleixequitylaws/illinoispreventingsexualviolenceinhighereducationact/.

*Loyola's Internal Policies & Procedures ("Comprehensive Policy")*

33.    In addition to the federal and state regulations described above, Loyola has its own internal policies and procedures once a student reports sexual misconduct, as detailed in the University's Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation ("Comprehensive Policy").[5]

34.    According to Loyola's Office for Equity & Compliance, Loyola's internal policies and procedures "meet[] or exceed[] the requirements of federal and state civil rights laws and regulations to provide for a prompt, fair, and equitable administrative process."

35.    In relevant part, the University's Comprehensive Policy provides:

- A preponderance of the evidence standard is used to determine whether a respondent is responsible for violating the Comprehensive Policy. This standard requires that the totality of the evidence, considered impartially, must indicate that it is more likely than not that the Comprehensive Policy was violated.

- Complainants *may* be accompanied by one advisor of their choice, provided that the selection of the advisor does not cause an undue delay of the Grievance Process, but the University will not delay meetings or proceedings to accommodate an advisor's availability.

- Complainants *may* request assistance from Loyola in identifying an available advisor, but the University does "not ensure or guarantee the quality or availability of any University-provided advisor."

- An advisor may be any person of the party's choosing, including an attorney; when an advisor is also an attorney, this must be disclosed to the University, and the advisor is limited to a "supportive" and "non-representative role." An attorney of the University's choosing may also attend any proceeding whenever an attorney serving as an advisor is present.

- Upon receiving a report of sexual misconduct, the University may implement a no contact directive; in all cases in which a no contact directive is implemented, the

_____

[5] *See* Loyola University of Chicago Comprehensive Policy and Procedures for Addressing Discrimination, Sexual Misconduct, and Retaliation, (last accessed September 12, 2022), https://www.luc.edu/media/lucedu/equity/pdfs/LUC%20Comprehensive%20Policy_2022-2023.pdf.

relevant parties will be promptly informed in writing of the conditions, duration, and applicable parameters of the directive.

- The University aims to complete all investigations into students' report of sexual misconduct within six months of receipt of the initial complaint.

- If an alleged violation of sexual misconduct is substantiated, the violating party may be subject to a range of outcomes—including suspension, expulsion, and the University withholding or revoking the assailant's transcript or degree.

36.    At the beginning of each academic year, a copy of Loyola's Comprehensive Policy is published and shared with University students, employees, parents, and the broader community. The above excerpts are from Loyola's 2020 Comprehensive Policy, but, upon information and belief, the University's Comprehensive Policy has remained materially the same since 2011.

### Catherine Ann Cappello ("Cappello")

37.    Catherine Ann Cappello ("Cappello") enrolled as a graduate student at Loyola in 2011.

38.    In 2012, Cappello was sexually assaulted by one of her classmates, who was also a visiting priest from a foreign country.

39.    When Cappello was sexually assaulted, she did not know of the University's policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual violence and sexual harassment.[6]

40.    When Cappello attempted to file a formal report with the Title IX office, she was precluded from doing so. Loyola administrators informed Cappello no action could be taken against her

---

[6] *See Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 981 (N.D. Cal. 2020) ("when [plaintiff] was assaulted, she did not know of the University's alleged policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual harassment. I join those courts that have held that a pre-assault claim under Title IX does not accrue until a plaintiff knows or has reason to know of such a policy of deliberate indifference").

assailant because he was visiting from another country, and, therefore, not under Loyola's direction and control.

41. Later that year, Cappello's professors assigned her to work in a small group with her assailant; when Cappello informed her professors she was not comfortable working in a small group with him because he had sexually assaulted and harassed her, Cappello was told the professors did not need "troublemakers" like her—she could either complete the group assignment or take an incomplete in the course; Cappello chose to take an incomplete.

42. Thereafter, Cappello operated with a heightened sense of fear, anxiety, and stress knowing her assailant continued to be in her classes and on Loyola's campus.

43. Attending classes in such a hostile environment became too much for Cappello to bear, and she opted to leave Loyola before completing her degree.

44. As a result of the University's misconduct, Cappello has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### *Madeline Kane ("Kane")*

45. Madeline Kane ("Kane") completed her undergraduate studies at Loyola in May 2022 and her graduate students at Loyola in 2023. In February 2020, Kane was sexually assaulted by another student at a party hosted by one of the five student fraternities recognized by Loyola.[7]

46. Thereafter, Kane electronically reported the incident to Loyola.

---

[7] *See* Loyola Center for Student Engagement, Recognized Sororities & Fraternities (last accessed September 12, 2022), https://www.luc.edu/studentengagement/sororityfraternitylife/recognizedsororitiesfraternities/.

47.     Several days after Kane submitted a formal grievance, on March 3, 2020, she received an email response from one of Loyola's Assistant Dean of Students and the acting Title IX Deputy Coordinator informing Kane the University had received the report.

48.     Kane also informed the fraternity's student leadership about the assault; consequently, the fraternity's leaders apologized to Kane and informed Kane a unanimous decision was reached her assailant, who was pledging the fraternity at the time, would not be allowed to join the fraternity.

49.     In contrast to the fraternity's response, and despite overwhelming evidence Kane proffered—including photos of bruises, texts, receipts, and multiple witnesses—Loyola took months to conduct an investigation and provided Kane with negligible support throughout the process.

50.     Kane was not provided a confidential advisor by the University, and she was forced to conduct parts of the investigation herself; Kane had to decide who Loyola should interview and what evidence the University should collect.

51.     The University also allowed Kane's assailant, along with the one friend he identified with knowledge of the assault, to delay the investigation process by skipping multiple interviews without consequence.

52.     Loyola did not adequately inform Kane of the resources and support available to her during the duration of the investigation; when Kane inquired about mental health care and other resources available to her, she was given negligible support from Dean Love and other Loyola administrators, and Kane was ultimately left to seek out resources and information on her own.

53.     Though Kane's perpetrator obtained an attorney to advise him, and in contrast to Loyola's Comprehensive Policy, Kane was informed by the University she could not obtain an attorney during the Title IX investigation.

54.     At one point during the investigation, Loyola also provided Kane a letter from a lawyer with her assailant's last name threatening to sue Kane.

55.     In September 2020, Loyola concluded its investigation into Kane's sexual assault by informing Kane via email her perpetrator was "not responsible" due to "insufficient evidence."

56.     After the investigation finished, Kane was drugged at a different fraternity party in April 2021, but she chose not to report the incident to Loyola because the first investigation was flawed and humiliating.

57.     For years, Maddie has operated—and, as a current student, she continues to operate—with a heightened sense of fear, anxiety, and stress knowing there are possible perpetrators in her classes that have not been removed by the University.

58.     As a result of the University's misconduct, Maddie has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### *Marissa Sepulveda ("Sepulveda")*

59.     Marissa Sepulveda ("Sepulveda") began her studies at Loyola in 2018; she was accepted to a five-year program and on track to graduate with a bachelor's and master's degree in social work in May 2023.

60.     In February 2019, Sepulveda was sexually assaulted by a male student inside a Loyola dorm building.

61.     Thereafter, Sepulveda informed her dorm's R.A. ("R.A."), and a Title IX investigation was initiated.

62.     Despite having actual notice and knowledge that Sepulveda's assailant violently assaulted Sepulveda, and he was a serious threat to other students, Loyola's Title IX coordinator and associate dean, Timothy Love ("Dean Love"), allowed Sepulveda's assailant to remain on campus with unfettered access to other Loyola students.

63.     Sepulveda's Title IX investigation continued for months, and, in April 2019, Sepulveda's assailant violently raped another female Loyola student; it was only after this second incident that a police report was filed and the assailant was removed from campus and expelled from the University.

64.     Several months later, in September 2019, Sepulveda was raped by another Loyola student on the bathroom of a University dorm building.

65.     Akin to Kane, because Sepulveda's first Title IX investigation was traumatizing and flawed, Sepulveda chose not to file a complaint with Loyola's Title IX Office until September 2021.

66.     When Sepulveda filed a report in September 2021, Sepulveda was informed by Dean Love and Loyola's administrators that her Title IX investigation would conclude by December 2021.

67.     Loyola's Comprehensive Policy provides no contact directives can be issued "request of a complainant, respondent, or other relevant individual, when warranted." It further provides the parties should "promptly informed in writing of the conditions, duration, and applicable parameters," and violation of a no contact directive "may be grounds for additional informal or formal intervention, including disciplinary action."

68.     Sepulveda requested a no contact directive against her assailant, which was granted by Loyola officials.

69.     But on at least two different occasions, Sepulveda's assailant made contact with Sepulveda and attended quidditch club events he knew Sepulveda would be present at.

70.     Thereafter, Sepulveda informed Dean Love about these incidents and requested disciplinary action be taken against her assailant.

71.     But Dean Love informed Sepulveda, despite having a no contact directive in place, the University could not require her assailant stop University events Sepulveda would be present at, but Dean Love would "recommend" her assailant refrain from doing so.

72.     In May 2022, over nine months after Sepulveda made her initial report, Dean Love informed Sepulveda during the final week of her undergraduate courses that the Title IX investigation had concluded, and Loyola determined her assailant was guilty of: (1) sexual misconduct, (2) non-consensual sexual contact, (3) non-consensual sexual penetration, and (4) dating/domestic violence.

73.     Despite this finding, Sepulveda learned her assailant would be graduating and receiving an undergraduate degree in business administration from Loyola; he would also be able to attend and walk at the University's graduation ceremony.

74.     Thereafter, Sepulveda protested and obtained over 2,600 signatures of other Loyola students urging the University to prevent Sepulveda's assailant from receiving a degree from Loyola and to prevent him from attending Loyola's graduation ceremony.

75.     Upon viewing Sepulveda's petition, a former Loyola student reached out to Sepulveda via social media to inform Sepulveda the student had left Loyola because she was also sexually assaulted, but the University failed to act and/or support her—the former Loyola student informed Sepulveda she had taken a year off from her studies and was now attending a community college.

76.     After Sepulveda learned her assailant had received his undergraduate degree from Loyola, she appealed this decision and requested the University revoke his degree—which the University lists as a potential consequence for students found guilty of sexual misconduct. Sepulveda's request the University revoke her assailant's degree, however, was met with silence from Loyola officials and no further action or reprimand was taken against Sepulveda's assailant.

77.     For years, Sepulveda was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant, and other possible perpetrators, continued to be in her classes, club events, and on Loyola's campus.

78.     Attending classes in such a hostile environment became too much for Sepulveda to bear, and she opted to leave Loyola before completing her five-year program.

79.     As a result of the University's misconduct, Sepulveda has suffered physical, psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

### Amma Appiagyei ("Appiagyei")

80.     Amma Appiagyei ("Appiagyei") enrolled as an undergraduate student at Loyola in 2013.

81.     In the Spring semester of 2014, Appiagyei was sexually assaulted by another student.

82.     In the aftermath of the sexual assault, Appiagyei feared reporting the incident to law enforcement and feared receiving medical attention due to concern she would incur significant medical expenses and be forced to tell her parents thereafter.

83.     Appiagyei did report the sexual assault to Loyola officials.

84.     Following her report, an article was published by the University without Appiagyei's consent that referenced her sexual assault, causing Appiagyei to feel exposed and embarrassed that information about her sexual assault was publicly available to her peers and student body;

14

Appiagyei does not know which Loyola administrators provided information beyond the Title IX Office without her consent.

85.     After reporting the incident, Appiagyei was moved to a different dorm in the middle of the night, leaving her isolated from friends and her support system at the University. Meanwhile, her assailant was allowed to remain in his dorm without disruption or any consequences.

86.     Despite a no contact directive, Appiagyei recalls seeing her assailant at the University's dining hall, causing further anxiety and stress around her safety.

87.     During the University's Title IX investigation, Appiagyei was required to attend a hearing with a panel and her assailant present. During the hearing, Appiagyei was directed by University officials to reenact and narrate how her assailant sexually assaulted her in front of her assailant and a panel of unfamiliar administrators. Appiagyei recalls this was deeply traumatizing and revictimizing.

88.     Among fellow students, it was known that Appiagyei's assailant had sexually assaulted other women and demonstrated a repeated behavior of unwanted sexual advances, which included forceful and unwanted kissing and touching. On one occasion—which other students were witness to—Appiagyei's assailant made forceful and unwanted sexual advances against another female student while in a Loyola elevator.

89.     After Appiagyei was sexually assaulted, Appiagyei learned she had frequently attended University events with, Ben Holm, who was criminally charged with violently raping an underage girl. Appiagyei frequently saw Holm around campus and at Loyola fraternity parties; many of Appiagyei's close friends attended class and were assigned to work in small group settings with Holm. Upon information and belief, Loyola knew or should have known about Holm's criminal charges, but the University admitted Holm on a golf scholarship and allowed Holm to attend

classes at the University; after attending classes for three years at Loyola, Holm pled guilty and was convicted for the aforementioned charges, receiving a ten-year prison sentence.

90. During Appiagyei's Spring 2014 semester, Appiagyei's assailant was found guilty and expelled from Loyola.

91. But Appiagyei was also expelled by the University the following summer after being placed on academic probation. Loyola officials failed to provide Appiagyei with academic accommodations after she was sexually assaulted.

92. After Appiagyei was expelled from Loyola, she began taking classes at community colleges. Appiagyei has had difficulty maintaining steady employment and her mental and physical health has suffered tremendously since she was sexually assaulted at Loyola. Appiagyei has been diagnosed with depression, PTSD, self-harming behaviors, anxiety, and substance abuse.

93. While a student at Loyola, Appiagyei was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant attended her classes and other perpetrators were also attending classes and extracurricular activities on Loyola's campus.

94. As a result of the University's misconduct, Appiagyei was not able to obtain her bachelor's degree, which has diminished her earning capacity significantly. Appiagyei has also suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

*Jane Doe C*

95. Jane Doe C enrolled as an undergraduate student at Loyola in 2013.

96.     In 2014, during her sophomore year, Jane Doe C was subjected to multiple acts of domestic violence at the hands of another male Loyola student; many of these incidents of violence occurred on Loyola's campus.

97.     Following her injuries, which were severe and included visible bruises, bleeding, and swelling, Jane Doe C confided to a professor that another Loyola student had injured her and subjected Jane Doe C to repeated acts of dating violence.

98.     The professor informed Jane Doe C she was a mandated reporter and was required to report Jane Doe C's injuries and the acts of sexual violence perpetrated against Jane Doe C to Loyola's Title IX Office; Jane Doe C received no follow-up from any University administrators or the University's Title IX office, however, and Jane Doe C's assailant continued to terrorize and commit violent acts against Jane Doe C.

99.     After one especially bad act of violence was perpetrated against Jane Doe C, Jane Doe C sought the intervention of and made a report to Loyola's Campus Safety officers. Thereafter, both Jane Doe C and Jane Doe C's assailant were brought in for questioning. Jane Doe C recalls Campus Safety told Jane Doe C if she wanted to pursue any action against her assailant, she would need to make a report to the Chicago Police Department and Loyola could take no disciplinary action against Jane Doe C's student, who was also a Loyola student.

100.    Jane Doe C the decision to report her assailant to Chicago police and she declined out of fear.

101.    Having received no guidance from Loyola Campus Safety and fearing retaliation from her assailant, Jane Doe C declined to file a report with the Chicago Police Department.

102.    In another instance, Jane Doe C's assailant bit Jane Doe C's finger so badly Jane Doe C sought medical attention from Loyola's Wellness Center.

103.    Jane Doe C recalls the nurse who attended to her injury inquired how Jane Doe C injured her finger and showed skepticism when Jane Doe C replied she had injured herself while babysitting; but the nurse did not follow up with Jane Doe C thereafter.

104.    Jane Doe C made it known to University administrators that her assailant and his family were calling and messaging Jane Doe C threatening to take action against her if Jane Doe C's assailant received any disciplinary action against him by University officials and/or law enforcement.

105.    Jane Doe C also provided extensive evidence, including photographs of her injuries, to Loyola administrators to show her assailant was violent and a threat to other students on campus.

106.    Despite this, no disciplinary action was taken against Jane Doe C's assailant; he was allowed to remain on Loyola's campus with unfettered access to other students. To date, Jane Doe C remains unsure if the domestic violence perpetuated against her was statistically reported, as required by the Clery Act, and whether a formal Title IX investigation was conducted by the University.

107.    Jane Doe C learned that after she reported the domestic violence perpetuated against Jane Doe C, Jane Doe C's assailant assaulted another student at a basketball game and was suspended from campus for one week; thereafter, Jane Doe C's assailant was allowed to return to campus.

108.    Two years after Jane Doe C reported the domestic violence described herein, Jane Doe C learned her assailant was in the same class as Jane Doe C, which she learned after arriving to the first day of class and confronting her assailant face-to-face.

109.    Jane Doe C reported to Loyola administrators that her assailant was in the same class as Jane Doe C. In response, Jane Doe C was told it was "up to her" whether or not to contact her assailant and request he change courses.

110.    Out of fear and receiving further threats from her assailant and his family, should Jane Doe C be the one to ask her assailant to change his course schedule, Jane Doe C refrained from doing so.

111.    Given the above, Jane Doe C did not feel safe nor protected at her University.

112.    For years, Jane Doe C was forced to operate with a heightened sense of fear, anxiety, and stress knowing her assailant, and other possible perpetrators, continued to be in her classes, club events, and on Loyola's campus.

113.    As a result of Loyola's misconduct, Jane Doe C has suffered psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

114.    As a result of the University's misconduct, Jane Doe C has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### *Jane Doe N*

115.    Jane Doe N was enrolled at Loyola University from 2018 to 2019; thereafter, Jane Doe N transferred to another university, where she is enrolled as an undergraduate student to date.

116.    In December 2018, Jane Doe N's Loyola dorm room was burglarized.

117.    After leaving their dorm room for the evening, Jane Doe N and her roommate returned to find the door open and the lock damaged. Jane Doe N's computer and other electronics and items had been stolen from the room.

118.    After reaching out to friends and others living in the same dorm, Jane Doe N learned an unknown male had entered Jane Doe N's dorm room and a number of other rooms in Jane Doe N's dorm claiming it was the "wrong room," upon encountering others present in the dorm.

119.    Jane Doe N then made a report to Loyola Campus Safety officers and the Chicago Police Department.

120.    The Chicago Police Department investigated the crime but was unable to identify the thief due to lack of camera footage in Jane Doe N's dorm, despite assurances otherwise, and no support or follow-up action taken by Loyola Campus Safety officers.

121.    Jane Doe N received no support, follow-up, or communication from Loyola regarding the break-in and/or the theft of her items—they were never recovered nor did Loyola provide Jane Doe N with any explanation as to what had occurred the evening of the break-in.

122.    Though Jane Doe N's computer—containing all of her coursework—was stolen, Jane Doe N was not provided with any accommodations or assistance in her classes from Loyola.

123.    Loyola dorms have multiple checkpoints where students are required to show a student ID upon entry; upon information and belief, the individual who broke into Jane Doe N's dorm, however, was able to surpass these checkpoints without showing ID and obtaining access to residence floors.

124.    As a result of this break in, Jane Doe N no longer felt safe in her dorm room and requested a transfer to a different dorm that was known to have more robust safety measures. The University rejected this request.

125.    In January 2019, approximately one month after her dorm room was broken into, Jane Doe N was sexually assaulted by another Loyola student.

126.    Jane Doe N's plea to Loyola for support and assistance after her dorm room had been burglarized had already gone unaddressed by the University. Moreover, Jane Doe N knew scores of other Loyola students who made reports to the University's Title IX Office that not only went unanswered but resulted in further trauma and stress for the victims. Jane Doe N was advised by

20

her female peers not to make a Title IX report because it would only amplify her physical and mental distress.

127. Additionally, after making several inquiries, Jane Doe N did not receive clear communication from Loyola regarding how she could—or should—go about filing a report and pursuing an investigation; no resources were made available to Jane Doe N.

128. Ultimately, Jane Doe N decided to transfer to remove herself from a university and campus where a culture of deliberate indifference to sexual assault pervaded.

129. As a result of the University's misconduct, Jane Doe N has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Jane Doe H

130. Jane Doe H began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

131. Jane Doe H was assaulted by a Loyola student known to be a serial predator; upon information and belief, this individual sexually assaulted Jane Doe H and five others—six victims in total.

132. It took Jane Doe H months and multiple attempts before the University recorded Jane Doe H's sexual assault, as mandated by Illinois and federal law.

133. Initially, Jane Doe H reported to her Resident Advisor, who was in charge of supervising the Resident

134. Thereafter, the Resident Director—who is a fulltime Loyola employee tasked with overseeing all Resident Advisors and students residing in the dorm—called a dorm-wide meeting;

in front of Jane Doe H and 60 of Jane Doe H's peers and dormmates the Resident Advisor demeaned Jane Doe H by referring to her as a "whiny little brat."

135.    Despite being told by Jane Doe H's R.A. a formal Title IX complaint had been made to the University, Jane Doe H received no follow up information or support from Loyola; Jane Doe H would later learn no Title IX case had been initiated.

136.    Throughout the Fall 2019 semester, Jane Doe H was forced to live directly next to her assailant and experienced significant anxiety and fear her assailant would enter her room and attack her again.

137.    Jane Doe H was assaulted again by the same assailant in October 2019; this assault was preventable, had Loyola followed its legal obligations per Illinois and federal law.

138.    The day prior to Thanksgiving break, Jane Doe H brought the sexual assault, the lack of University support, and the toll it had taken on her physical and mental health to the attention of a professor.

139.    Jane Doe H's professor learned no formal Title IX grievance had been filed to date. Jane Doe H learned from her professor and peers the University often did not file Title IX grievances until students contacted the "Advocacy Line" ("the Line") a resource independent of Loyola's Title IX Office and Office of Compliance and Equity; "the Line" was started by Loyola students who found they were not offered any support services and resources by Loyola's Title IX Office and Office of Compliance and Equity.

140.    From there, confusion ensued, as Jane Doe H was forced to call upon multiple resources, including her professor and "the Line," until an official Title IX was filed against this assailant.

141.    After Thanksgiving 2019, Jane Doe H learned her assailant had sexually assaulted four other students.

142.    Without first advising Jane Doe H or any of the other victims, Tim Love gave a statement on the case to a local news outlet during midterms, which was traumatizing for Jane Doe H and significantly impacted her grades.

143.    Loyola also forced Jane Doe H during final exams, which caused Jane Doe H tremendous stress and caused Jane Doe H's grades to suffer.

144.    Despite five victims reporting the same assailant, it took Loyola over a year to complete its investigation and expel this assailant; upon information and belief, Loyola never reported the presence or misconduct of this serial predator to law enforcement.

145.    As a result of the University's misconduct, Jane Doe H has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Jane Doe G

146.    Jane Doe G began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

*147*.    On approximately November 7, 2019, Jane Doe G was sexually assaulted by the same Loyola student and assailant that Jane Doe H had made multiple attempts to report to University administrations months prior; as such, Jane Doe G's sexual assault was preventable had Loyola followed its legal obligations as prescribed by Illinois and federal law.

148.    Soon after Jane Doe G was sexually assaulted, Jane Doe G was notified by her assailant's male roommate that Jane Doe G's assailant had assaulted at least two other female students in the dorm room he shared with the assailant.

149.     On November 13, 2019, Jane Doe G reported the incident to the professor of an entry level course Jane Doe G and her assailant were both enrolled in. Jane Doe G expressed she was uncomfortable sitting near her assailant or being in a group with him due to the sexual assault. Jane Doe G's professor was a mandated reporter and filed a Title IX report on Jane Doe G's behalf.

150.     On November 14, 2019, Jane Doe G received confirmation the Title IX report was filed and received by the University. After learning there were multiple other victims, Jane Doe G informed Loyola she wanted to pursue a Title IX investigation.

151.     Jane Doe G was encouraged by the Title IX office to keep her complaint "internal;" Loyola was adamant Jane Doe G did not need to seek resources outside the University because Loyola was "handling it."

152.     Loyola declined to provide Jane Doe G with any resources she was entitled under Illinois and federal law throughout the investigation; when Jane Doe G requested an advocate to support her, University officials were silent.

153.     Later in the investigation, Loyola officials did make it known to Jane Doe G the Title IX Office had received multiple other complaints against Jane Doe G's assailant.

154.     Loyola officials explicitly asked Jane Doe G to refrain from attempting to speak with or contact her assailant's other victims; Jane Doe G was told this would make the University's Title IX investigation "easier" for the University. Jane Doe G was not provided a support advocate and discouraged from speaking with an attorney or law enforcement throughout this process.

155.     Loyola officials requested Jane Doe G meet with them on multiple occasions. During one meeting, Jane Doe G was asked to retell her story and physically "act out" how her assailant had sexually assaulted Jane Doe G. A Loyola administrator requested Jane Doe G "move her body"

and "touch herself" in a way to that reenacted the sexual assault for University officials. Jane Doe G felt these requests were not only highly inappropriate but retraumatizing for her.

156.    After Jane Doe G's Title IX report was filed by Jane Doe G's professor, Loyola offcials informed Jane Doe G a "no contact" directive would be enforced against Jane Doe G's assailant. When Jane Doe G learned her assailant was enrolled in one of Jane Doe G's Spring 2020 courses, however, Loyola advised Jane Doe G the University could not "force" her assailant to choose a different course; Loyola officials encouraged Jane Doe G to contact her assailant and request he choose a different course selection. Concerned and confused by this, Jane Doe G communicated this directive to her assigned Title IX investigator; Jane Doe G was informed by the investigator she would "not get in trouble" should Jane Doe G contact her assailant and request her choose a different course selection.

157.    Jane Doe G's assailant refused to modify his class schedule and Jane Doe G was forced to attend class with her assailant for an entire semester and throughout an active Title IX investigation, despite five other victims reporting the same assailant for serious sexual misconduct against them.

158.    Jane Doe G's Title IX hearing was held on March 4, 2020. Jane Doe G contacted the investigator assigned to her case several times over the course of the next month requesting an update. A preliminary report was provided on April 15, 2020, which pertained to Jane Doe G's sexual assault only. The report made available to Jane Doe G included little more than the summary of the initial report made to Jane Doe G's assigned investigator.

159.    Thereafter, Jane Doe G learned at least five other victims had filed Title IX reports against the same assailant; at least four reported they had been sexually assaulted by this assailant before

Jane Doe G was sexually assaulted in November 2019. Jane Doe G's sexual assault was preventable.

160.    It was not until July 24, 2020, that Jane Doe G was informed her assailant had been found responsible for sexual misconduct by the University—over nine months after Jane Doe G initially reported to Loyola officials and at least five other victims had also independently reported the same assailant sexually abused them.

161.    If not for Loyola's systemic mishandling and underreporting of sexual misconduct, current students, like Jane Doe G, would not be victim to a campus deliberately indifferent to sexual assault; Jane Doe G's sexual assault was preventable; Title IX and Illinois laws were enacted to keep university students—like Jane Doe G—safe.

162.    As a result of the University's misconduct, Jane Doe G has suffered psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

163.    As a result of the University's misconduct, Jane Doe G has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### Jane Doe A

164.    Jane Doe A began her studies at Loyola in 2019; she is currently enrolled as a Loyola student and fears the University will retaliate against her, should she be named in this lawsuit.

165.    In August 2019, during one of Jane Doe A's first weeks as an undergraduate student on Loyola's campus, Jane Doe A was invited to the dorm room of a male sophomore student; Jane

Doe A arrived and brought one other female student whom she had just met in her residence hall during Fall 2019 "Welcome Week."

166.    Jane Doe A arrived and brought several other female students that were rushing the same sorority as Jane Doe A.

167.    Prior to arriving, Jane Doe A had consumed one fourth of a can of "Truly" vodka seltzer.

168.    After arriving within the hour, the assailant offered Jane Doe A one shot of Fireball Cinnamon whiskey.

169.    After consuming the shot, Jane Doe A felt incapacitated to the point where she told her friend she felt she needed to lay down; Jane Doe A was then led to the assailant's bedroom.

170.    Jane Doe A learned that while she was incapacitated, her assailant had sexually assaulted Jane Doe A in his bed.

171.    Several months later, Jane Doe A reported the sexual assault to Loyola's Title IX Office and provided a number of witnesses and documents to the University.

172.    In February 2020, while Jane Doe A's Title IX investigation was underway, Loyola erroneously shared a document with Jane Doe A that indicated two other female students had reported they too were sexually assaulted by Jane Doe A's assailant.

173.    If not for Loyola's systemic mishandling and underreporting of sexual misconduct, students, like Jane Doe A, would not be one of numerous victims of the same assailant.

174.    As a result of the University's misconduct, Jane Doe A has suffered psychological and emotional damages, and she has experienced a loss of educational benefits and forfeited tuition and fees.

175.    As a result of the University's misconduct, Jane Doe A has suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and

future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

### *Fernanda Aragon*

176.    Fernanda Aragon ("Aragon") enrolled as an undergraduate student at Loyola in August 2019.

177.    On August 22, 2019, Aragon was sexually assaulted while incapacitated by another Loyola undergraduate student in his University dormitory room.

178.    Aragon woke up naked in her assailant's room in a state of panic and confusion; she immediately got dressed and left his dormitory room as quickly as possible.

179.    Prior to leaving, Aragon asked her assailant if he had ejaculated inside of her, to which he responded, "I don't know."

180.    The next day, however, Aragon's assailant purchased Plan B (the "morning after pill"), which he delivered to Aragon's dormitory room and instructed her to take.

181.    For many months, Aragon tried not to think about what happened to her because as a college freshman, she "did not want to deal with it" at the time.

182.    But months later, Aragon found herself grappling with depression, anxiety, and an overwhelming, misplaced sense of shame and guilt.

183.    As such, Aragon enrolled herself in therapy at Loyola, which offers students a maximum of seven sessions.

184.    As her therapy progressed, Aragon was able to begin processing her sexual assault and the toll it had taken thereafter on her physical, mental, and emotional well-being.

185.    Given the strides Aragon was making in therapy, she was distraught when the University informed Aragon her seventh therapy session would be her final meeting with her assigned Loyola therapist.

186.    When Aragon asked if she could continue to see her therapist and compensate Loyola out-of-pocket, she was informed by the University that even paying out-of-pocket was not an option; losing Aragon's only pillar of support at the University only compounded her stress, anxiety, depression, and feelings of guilt/shame. Aragon was forced to expend considerable time and resources to find a new therapist, unaffiliated with the University.

187.    When Aragon was sexually assaulted, she did not know of the University's policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual violence and sexual harassment.[8]

188.    On March 21, 2021, at 3:06 a.m. CST, Aragon submitted an official report detailing her sexual assault to Loyola's Office of Equity & Compliance.

189.    On March 15, 2021, at 10:42 a.m. CST, Aragon received an official correspondence back from Loyola stating "a letter has been issued to you electronically by [the Office of Dean of Students]."

190.    Thereafter, Aragon had a meeting with Samantha Maher Sheahan, Associate Dean of Students, during which Aragon indicated she wanted to file a "formal" Title IX grievance.

---

[8] *See Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 981 (N.D. Cal. 2020) ("when [plaintiff] was assaulted, she did not know of the University's alleged policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual harassment. I join those courts that have held that a pre-assault claim under Title IX does not accrue until a plaintiff knows or has reason to know of such a policy of deliberate indifference").

191.     On March 29, 2021, Aragon received an official correspondence from Tim Love, "Executive Director & Title IX Coordinator."

192.     Throughout the Title IX investigation and formal complaint resolution, Aragon's assailant was represented by an experienced criminal defense attorney.

193.     But Loyola did not inform Aragon her assailant was represented by an attorney. When Aragon inquired about an advocate, the University assigned Aragon a non-attorney Loyola employee with a background in higher education, who worked in the Wellness Center.

194.     Aragon provided a number of witnesses, documented messages, and a photograph of the Plan B pill that Aragon's assailant had purchased for her the day after she was raped.

195.     Despite Loyola stating this in its "Comprehensive Policy," and, in contrast to other survivors, Aragon was required to send the questions her advocate would ask her assailant to Dean Love for approval prior to the final hearing which was held on September 10, 2021.

196.     Aragon and her advocate submitted the following questions:

- What is your understanding of consent?
- You mentioned that the "other guys would have stopped you". Whose responsibility is it to get consent in a sexual encounter?
- Did you ask me if I was sober enough to consent?
- Are you aware of why some people do not come forward right away after an assault?
- I would not have taken Plan B if I knew you didn't ejaculate. Why did you tell me you ejaculated if you didn't?
- Why did you text the roommate "Is she okay, is she fine?" after I left?
- Why do you think I would have agreed to not using a condom when I've never expressed otherwise?
- Are you aware that rape is the most underreported crime? (source: RAINN)

197. Aragon recalls she was peppered with a number of very detailed questions by Attorney

Purav Bhatt, which her advocate did not prepare Aragon for, causing Aragon to become very

flustered and distressed.

198. At the end of Aragon's final Title IX hearing, Aragon read the following closing statement:

To ▮▮▮▮

Before you raped me, my loved ones would describe me as a ray of sunshine, always looking to spread positive energy into everyone's heart in hope of bringing smiles onto the faces that surround me. After you raped me, I slowly started falling in a deep hole of depression and feelings of unworthiness - however for 17 months I could not comprehend the sudden hopelessness. I attended therapy, and to my surprise after unraveling my life story to my therapist, I learned that you did in fact, rape me and ultimatley stripped away the dignity I once held as a young woman. Regardless of becoming stronger through therapy and medication, there are days that the trauma brings me down once again into a profound hole of feelings of unworthiness, enough to send me into the psychiatric unit for the trauma that you inflicted upon me, that my psychiatrist and my loved ones fear could weaken me to the point of finding no other reason to keep going. But I am here to tell you that today and tomorrow, I now hold the reins and will never let you hold any power over me, and I have brought my story forward in hopes of saving someone from being hurt by you again. While you may not think that you did anything to hurt me, physically, mentally, or emotionally, because of you, I now fear having a daughter, because I am terrified that she'll encounter someone as malicious as you.

▮▮▮▮ with the most pure intentions, I truly hope and wish that you find the help that you need, whatever that entails.

To the hearing board:

I came to Loyola under a promise that I would not just be another number or another statistic in the midst of all students, but rather that I would be seen and respected for the person I am in this institution. In this moment, I ask for you to not see me as a number or a statistic, but rather as a student that has faced something so common yet so horrendous on this campus. Every day I carry the regret of letting myself get to the point of incapacitation and en-bloc blackout, as I tell myself that if maybe I hadn't had the drinks that I did that night, we would not be gathered here today. However, after various therapists, various psychiatrists and a high-risk psychiatric hospitalization due to my trauma from being raped, also known as delayed-onset PTSD, I have grown and accepted that this never was and never will be my fault, and I carry hope in my heart that you can see this too. While you don't know me on a personal level, I just ask of you to imagine me as a loved one, maybe a daughter, younger sister or even the little girl you once babysat back in high school, and think about what would be best for them if they were standing in my place right now. I will not ask for pity or empathy, and I hope the courage it took me to bring forth my rape will prevent it from happening to anyone else.

Thank you

31

199. On October 21, 2021, Aragon learned the University had made a "no finding" against her assailant citing "insufficient evidence."

200. Aragon was panic-stricken to learn her assailant would not be reprimanded and allowed to remain on campus; she lived with fear and anxiety, constantly wondering if she would be forced to cross paths with or attend a future class with him.

201. To make matters even worse, shortly thereafter, Aragon learned Loyola had hired her assailant to work in the undergraduate library; a no-contact directive issued by the University remained in place between Aragon and her assailant.

202. Dean Love made it very clear to Aragon that either the complainant or respondent could violate the no-contact directive, as evidenced by the official correspondence Aragon received from Loyola when she initiated her formal Title IX complaint process:

> Effective immediately, Respondent is to have **NO CONTACT**, whether direct or indirect, with Complainant. Similarly, to avoid any further conflict and to maintain equity, Complainant is to have **NO CONTACT** with Respondent. Note that *either* party may be found in violation of this directive.
>
> For the purposes of this directive, "contact" may include, but is not limited to:
>
> 1. Intentional in-person communication;
> 2. Telephone calls, text messages, or other direct messages;
> 3. Instant messages, emails, social media postings, or any other messages conveyed electronically; and/or
> 4. Any of the above contact facilitated through a third party
>
> Please note that efforts/attempts to communicate or completed communication will be treated the same. If you attempt to contact any of the named individuals above (or if they attempt to contact you), the initiator will be in direct violation of this directive and section 201(8) of the *Community Standards* ("Failure to comply"). While it is possible that you may see each other on or off campus at some point, you are expected to respect this directive in good faith at all times. Any evidence presented to the OEC that indicates that this directive may have been violated may result in increased and/or additional allegations being added to the current investigation, and may also subject the offender to additional interim restrictions and/or expedited disciplinary action.

203. When Aragon inquired about her assailant working in the undergraduate library, where Aragon had regularly studied previously, University administrators told Aragon, "Nothing could

be done" about this; instead, administrators provided Aragon a list of alternative study locations Aragon could visit instead of the undergraduate library.

204. In April 2021, Aragon was sexually assaulted by another Loyola student on the University's campus; because reporting her first sexual assault had failed and revictimized Aragon, she chose not to report the second assault.

205. Left with no further recourse from the University, and vigilantly concerned for her own safety and the safety of other women on campus, Aragon posted a video to her social media in January 2022 denouncing the University for allowing her assailant to walk free.

206. On February 1, 2022, Aragon received a formal correspondence from Loyola indicating she had violated the University's Community Standards, specifically for "Harassment and Bullying."

207. The University set an immediate administrative hearing with Aragon on February 3, 2022.

208. On February 9, 2022, a mere six (6) days after Aragon's administrative hearing, Aragon received an official correspondence from Loyola indicating she would be placed on "University Probation:"

Dear Fernanda,

This letter will summarize the outcome of your recent administrative hearing, where we discussed the report of your alleged misconduct on January 21, 2022.

After reviewing all available information related to this incident and discussing it with you, I have made the following determinations regarding your responsibility for the following policy/policies of Loyola's Community Standards:

201(12) Harassment and Bullying (B or C) -- Responsible

In response to this behavior and in consideration of your conduct history (if applicable), you are assigned the following outcome(s):

**University Probation**
You are being placed on University Probation until May 13, 2022. University Probation is formal notice to you that your behavior is unacceptable in the Loyola community and continued misconduct while on probation could result in suspension or expulsion from the University. Students on University Probation also may not hold certain leadership positions, as determined by the standards of individual registered and sponsored student organizations, until after their probation period has ended.

209.     Loyola administrators informed Aragon this "probationary period" would remain on her official University record and transcript for at least seven years—i.e., if Aragon applies to graduate school, Aragon's records from Loyola will indicate Aragon was placed on probation by the University for "Harassment and Bullying."

210.     The University also indicated administrators would be contacting Aragon's parents to inform them that Aragon had been placed on probation for "Harassment and Bullying:"

**Parent/Guardian Notification**
Although not technically a sanction, we wish to inform you that in this case, a letter will be sent to your parent(s)/guardian(s) stating you were found responsible for violating the conduct policies of Loyola University Chicago. This is per the administrative procedures outlined in the Community Standards. No action is required on your part, although you are encouraged to discuss this with your parents before they receive the letter. This action is not subject to appeal.

211.     Aragon appealed the University's decision to place her on any probationary period. In Aragon's appeal, she included statements from the following individuals who voiced firsthand

knowledge of Loyola's deliberate indifference to sexual assault and harassment and the similar experiences and injuries they had suffered:



Sending love to you as an LUC alumn. It pains me that they continued to let rapists walk free. I graduated 10 years ago and nothings changed

1-19  Reply



When I went to Loyola they gave a guy accused of rape a huge golf scholarship. I remember him being so creepy, and Loyola let him in! I'm sorry!

1-19  Reply



Loyola is such trash. I worked there for a year, the things I would hear. 🤨 I feel bad for all the girls. This definitely isn't the 1st time either.

1-20  Reply





my r*pist goes to loyola too im so sorry bae :(

1-19  Reply



LUC is notorious for sweeping s.a cases under the rug. I'm sorry they treated you like sh*t.

1-20  Reply





This happened to me but was a graduate assistant teaching a class and instead of expelling him, they gave him an award for teaching 3 months later🙄

1-19  Reply

Didnt another girl just have the same thing happen last year! LUC needs to be held accountable

1-19  Reply

I go to LUC too, and so many women have been SA'd on that campus and the school does nothing

1-20  Reply

luc student!! loyola does not prioritize student safety in the slightest.

1-20  Reply



This isn't the first time this happened at LUC - graduated a couple years ago and this same thing happened 😔 so sorry you're going through this

1-20  Reply

Girl I went to Loyola and the same thing happened to me they did nothing. I'm so so sorry this happened to you.

1-21  Reply

There are so many people that have been failed by the Title IX office at LUC. I'm so sorry you had to go through this

1-21  Reply



My first year there they allowed a golf student athlete keep his scholarship after it came out that he assaulted and underage girl in his home town1/2

1-21   Reply

2/2 worst part was he pled guilty I'm pretty sure and Loyola was like ya he can stay on scholarship

1-21   Reply



Honestly, the school has a history of this response. I graduated in 2013 & we had multiple instances of this. I'm so sorry you're going through this

1-22   Reply



that's so upsetting and not surprising, i reported someone WHO WORKED THERE trying to take a drunk-

1-24   Reply

girl home- picture evidence and all and nothing was done. FCK LOYOLA

1-24   Reply



As a luc student I'm so tired of Loyola not doing anything about this. I'm so so sorry love

1-25  Reply



1



sending support girl❤️I go to luc and I am so shocked at how admin here and at other colleges deal with any situation

1-19  Reply



Luc protected my abuser as well. You're not alone girlie. I'm sorry this is something you had to go through.

1-19  Reply



As a fellow luc student, I'm honestly sick of admin not listening to us. Like we protest and post and spread awareness and nothing happens

1-18  Reply



as a graduate from luc, loyola's osccr does absolutely nothing for their students. an absolute waste.

1-19  Reply







212.    At least two current Loyola students and survivors—one of Aragon's roommates, and one of Aragon's sorority sisters—have informed Aragon that, after being there for Aragon while she went through the Title IX process which resulted in a no finding against her assailant, and the University placing Aragon on probation for "Harassment and Bullying" thereafter, they are too intimidated to come forward to report their sexual assaults out of fear the University will revictimize and retaliate against them too.

213.    Because of Aragon's sexual assault and Loyola's flawed, humiliating Title IX investigation and decision to place Aragon on probation for "Harassment and Bullying" thereafter, Aragon has struggled with anxiety, depression, PTSD, and suicidal intimations and a resultant hospitalization.

214. While Aragon was forced to navigate Loyola's Title IX formal complaint proceedings with little support from the University, Aragon also fell behind in her classes and failed one course; Aragon is required to take a "make-up" class from May 2023 through July 2023, despite previously being on track prior to receive her undergraduate degree in May 2023.

215. Aragon, who planned to go to graduate school after graduating Loyola, has decided against doing so in fear of not being accepted due to the probationary period she was placed on for "Harassment and Bullying," which will be reflected in her transcript from the University.

*Jane Doe B & Jane Doe M*

216. Jane Doe B and Jane Doe M both enrolled as undergraduate students at Loyola in August 2016.

217. During the Fall 2016 semester, both Jane Doe B and Jane Doe M were sexually assaulted by their former male classmate—a known serial predator.

218. Loyola administrators were made aware of Jane Doe B and Jane Doe M's assaults in February 2017, but their assailant was allowed to remain living on campus and taking classes for the next 2.5 years with unfettered access to other victims, despite the University's knowledge female students had come forward to report he sexually assaulted them on Loyola's campus; Jane Doe B and Jane Doe M were forced to attend classes with and see their assailant on campus for 2.5 years after their assaults.

219. When Jane Doe B and Jane Doe M questioned Loyola administrators as to why he was allowed to remain of campus, they were told, "he's not a threat to campus," so he was not banned outright.

220. Though administrators were first made aware of Jane Doe B and Jane Doe M's sexual assaults in February 2017, no action was taken by Loyola to investigate or remove their assailant

from the University until Jane Doe B and Jane Doe M filed separate "formal" investigations with Loyola's Title IX office during the first week of December 2018; a third victim also filed a separate "formal" investigation against their assailant in December 2018.

221. Each case was assigned to different investigators, who were Loyola employees with other roles at the school "trained" and tasked with handling Title IX investigations as needed.

222. Jane Doe M worked at Loyola, and yet inexplicably, the investigator assigned to her case turned out to be her boss. When Jane Doe M expressed discomfort with her boss investigating her sexual assault, Jane Doe M was required to wait a significant time period for a new investigator.

223. Despite Loyola informing Jane Doe B and Jane Doe M the "official" Title IX investigation should take 60 days to complete, Jane Doe B and Jane Doe M were forced to wait nearly six months—from December 2018 to May 2019—for the investigation to conclude, allowing their assailant to finish his academic year at Loyola and transfer to another university to complete his undergraduate studies thereafter.

224. Jane Doe M remembered words the investigator used to describe her feelings, which she said were inaccurate, including the word "disappointed."

225. The University also sent a summary of the victims' Title IX allegations containing numerous grammatical, content and structural mistakes, in which the titles "complainant" and "respondent" were switched.

226. A Title IX investigator also erroneously sent Jane Doe B's confidential personal information to her assailant—a mistake the investigator only realized after it was brought to the investigator's attention by Jane Doe B.

227. In response, Tim Love conceded, "If I received back a report like that I could understandably be disappointed or not have that sense of trust we're shooting for."

228.     Jane Doe M's investigation was the first to conclude and resulted in a guilty finding on March 27, 2019 of rape—formally known as "non-consensual sexual penetration;" Jane Doe B and Jane Doe M's assailant was then placed on university probation.

229.     As "punishment" for rape, Loyola assigned him ten (10) hours of community service "to symbolically repair the harm Respondent caused" and a 3-page double spaced paper on the "meaning of consent;" Tim Love and other administrators encouraged Plaintiffs' assailant to "use resources available on campus, such as those provided by the Wellness Center"—where Love knew Jane Doe M was employed at the Center's front desk.

230.     Jane Doe M did not believe this was sufficient and appealed the verdict; her appeal resulted in the assailant's reprimand increasing to a suspension, documents show.

231.     Jane Doe B and the assailant's third victim were told by the University they would have an administrative verdict by April 18, 2019, before Easter break. But that day came and went without a verdict, rather Plaintiffs received emails from the school saying the cases would be "queued," creating confusion for the women.

232.     On April 26, 2019, a third victim was told the accused student would be expelled, documents show.

233.     On May 6, 2019, Jane Doe B was informed the University had finished investigating her case, and, inexplicably, the male student was not found guilty of assault in her case, records show. This erroneous outcome and Loyola's deliberate indifference to Jane Doe B's sexual assault caused Jane Doe B further injury; Jane Doe B did not appeal this decision only because she learned from Loyola administrators that her assailant had been expelled from the University.

234.     The University did not inform Jane Doe B and Jane Doe M—and Jane Doe B and Jane Doe M were horrified to learn—that Loyola had allowed their assailant to transfer to another institution

to complete his undergraduate studies; upon information and belief, their assailant is now completing a PhD program, where he teaches, supervises, and has unfettered access to undergraduate students.

235.     When Jane Doe B and Jane Doe M were sexually assaulted, they did not know of the University's policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual violence and sexual harassment.[9]

236.     Thereafter, Jane Doe B and Jane Doe M operated with a heightened sense of fear, anxiety, and stress knowing their assailant continued to be in their classes and on Loyola's campus.

237.     Attending classes in such a hostile environment became caused Jane Doe B and Jane Doe M's physical health and emotional health to decline, and their academic performance to suffer.

238.     As a result of the University's wrongdoing and Title IX violations, Plaintiffs have suffered physical pain and suffering, forfeited tuition and fees, diminished career opportunities and earning capacity, past and future medical expenses, emotional distress, psychological damage, and other direct and consequential damages in an amount to be determined at trial.

---

[9] *See Kane v. Loyola Univ. of Chi.*, 22 CV 6476 (N.D. Ill. Mar. 18, 2024) (Title IX claims are subject to Illinois' two-year statute of limitations, and the plaintiffs in *Kane* first filed their complaint on September 21, 2022; a claim accrues "'when a plaintiff knows the fact and the cause of an injury'" and is a question of federal law) (quoting *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) and *Wallace v. Kato*, 549 U.S. 384, 391 (2007)). *See also Vander Pas v. Bd. of Regents of Univ. of Wis. Sys.*, No. 21 C 1148, 2022 WL 1597423, at *6 (E.D. Wis. May 19, 2022) (for Title IX claims based on a policy or practice of deliberate indifference, a claim accrues "when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment"); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 702 (6th Cir. 2022), cert. denied., 143 S. Ct. 2659 (2023) (holding that "[i]n the Title IX context . . . [a] claim does not accrue until the plaintiff knows or has reason to know that the *defendant institution* injured them.") (emphasis in original).

**OTHER SALIENT FACTS**

239.    Plaintiffs are informed, believe, and on that basis allege, Loyola has systemically mishandled student complaints of sexual violence and sexual harassment, contrary to federal and state mandates and its own internal policies and procedures, dating back to at least 2011.

240.    Loyola's student newspaper, *The Phoenix*, has reported:

- In 2016, a female student's sexual assault report was lost by the University, which Dean Love acknowledged and apologized for.

- Dean Love has admitted Loyola has an "internal goal" of responding to reports within one business day—despite the fact Illinois law requires universities to respond within 12 hours.

- Multiple protests have been held, on a near yearly basis, by students demanding Loyola do more to combat violent sex crimes from occurring at the University.

- The University allowed a professor to continue teaching classes after determining several students' reports of his sexual misconduct to be credible.

- After three female students reported they were raped by the same male student on campus in 2018, it took the University five months, despite informing them it would take approximately 60 days, to find the students' allegations to be credible. The University initially sanctioned him by requiring he complete community service and write a paper on the meaning of consent—a gravely disproportional sanction for violently raping three students on campus.

- Students have reported the University's Title IX investigators have made serious errors in witness statements and sent emails with sensitive information to perpetrators versus survivors.

- Loyola found a male student guilty of rape and thereafter expelled and banned him from campus, but still allowed him to participate in his graduation ceremony.

241.    Plaintiffs are informed, believe, and on that basis allege, Loyola has also grossly underreported the number of sexually violent incidents that occurred during the years prior to Plaintiffs' enrollment at the University.

242.     In December 2017, University Security reported the Chicago Police Department had reported 873 violent crimes in Loyola's jurisdiction since 2013, but the University's Campus Safety had only reported 205.[10]

243.     Many of the violent crimes not reported by Campus Safety occurred within less than a five-minute walk from the University's campus, including 89 aggravated assaults and batteries, 94 robberies, 44 crimes with guns, and 29 sex crimes.[11]

244.     According to Loyola's Preventing Violence in Higher Education Annual Report, in 2016:

- 48 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office;

- 66 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource; and

- 68 incidents of "off campus" sexual violence, domestic violence, dating violence, and stalking were reported.[12]

245.     Thus, in total, there were 182 incidents of sexual violence, domestic violence, dating violence, and stalking reported by Loyola students in 2016.[13]

246.     According to Loyola's Preventing Violence in Higher Education Annual Report, in 2017:

- 36 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to Loyola's Title IX Office; and

---

[10] "Loyola Campus Safety Reports a Fraction of Crimes Compared to CPD," *The Phoenix* (updated January 31, 2018), (https://loyolaphoenix.com/2017/11/campus-safety-chronically-reports-crime/.

[11] *Id.*

[12] *See* Loyola's 2016 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022): https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20Univeristy%20Chicago_Annual%20Report%202016.pdf.

[13] *Id.*

- 93 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking were reported to a confidential and anonymous resource.[14]

247.    Loyola did not publish how many incidents occurred "off campus" or at "non-campus buildings or properties" in 2017, or any year thereafter.[15]

248.    Despite 129 incidents of "on campus" sexual violence, domestic violence, dating violence, and stalking reported to have occurred in 2017—and an unknown number of off-campus incidents—not a single student was reprimanded by the University in 2017, as shown below:

Loyola University Chicago                                                       Part B (II) (B)

**PART B (II)(B) Complaint Resolution Procedure Outcomes**

*It should be noted that several cases reported to have occurred outside of "Clery Geography" (i.e. at off-campus parties, apartments, etc.) were addressed through the complaint resolution process. However, given the reporting guidelines which advise to narrowly report only those incidents which occurred within "Clery Geography," these incidents and their related outcomes are not reflected in the data below.

|  | Found "not responsible" for violation of comprehensive policy | Dismissed/expelled | Suspended | Otherwise disciplined |
|---|---|---|---|---|
| Sexual violence | 0* | 0 | 0 | 0 |
| Domestic violence | 0 | 0 | 0 | 0 |
| Dating violence | 0 | 0 | 0 | 0 |
| Stalking | 0 | 0 | 0 | 0 |

---

[14] *See* Loyola's 2017 Preventing Violence in Higher Education Annual Report (last accessed September 12, 2022):
https://www.luc.edu/media/lucedu/equity/pdfs/Loyola%20University%20Chicago%202018%20ILPSVHE%20Annual%20Report%20(Submitted%20November%201,%202018).pdf.

[15] *Id.*

249.     The Department of Education Office of Postsecondary Education publishes the most recent three years of a university's self-reported sexual misconduct crime statistics.[16] According, to its website, from 2018 to 2020 Loyola reported:

- In 2018, there were 11 incidents of rape and 9 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2019, there were 7 incidents of rape and 4 incidents of fondling reported "on campus;" 0 incidents of rape and 0 incidents of fondling were reported on "non-campus" properties; and 2 incidents of rape and 0 incidents of fondling were reported on public properties.

- In 2020, there were 5 incidents of rape and 3 incidents of fondling reported "on campus;" 1 incident of rape and 0 incidents of fondling were reported on "non-campus" properties; and 0 incidents of rape and 1 incident of fondling was reported on public properties.

250.     Upon information and belief, the above data grossly underreports the number of violent sexual criminal offenses reported during from 2018 to 2020 within Loyola's Clery Geography, in violation of federal and state regulations in addition to the University's internal policies and procedures.

## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE IX ("PRE-ASSAULT")
*[Against Defendant Loyola University Chicago on behalf of all Plaintiffs]*

251.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

252.     The acts, and failures to act, perpetrated against Plaintiffs amounted to unlawful sexual harassment and discrimination on the basis of gender.

253.     Loyola maintained a *de facto* policy to suppress reports of sexual violence and sexual harassment, and to support accused campus predators, resulting in a culture of deliberate indifference toward sexual misconduct at Loyola.

---

[16] *See* U.S. Department of Education Office of Postsecondary Education (last accessed September 12, 2022), https://ope.ed.gov/campussafety/#/institution/search.

254.   Loyola had a *de facto* policy or practice of deliberate indifference to sexual assault that caused them to suffer or be vulnerable to severe, gender-based harassment.

255.   Plaintiffs allege that (1) Loyola maintained a *de facto* policy of deliberate indifference to reports of sexual misconduct, (2) the policy created a heightened risk of sexual harassment that was known (3) in a context subject to Loyola's control, and (4) as a result, Plaintiffs suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived them of access to the educational opportunities or benefits provided by Loyola.

256.   Loyola had actual knowledge its policies and procedures, as written and implemented, were enabling acts of sexual violence against its students, including Plaintiffs.

257.   The University maintained a *de facto* policy, detailed throughout this Complaint, to suppress reports of sexual violence and sexual harassment, and to support accused campus predators, resulting in a culture of deliberate indifference toward sexual misconduct at Loyola.[17]

258.   Thus, Loyola's actions and inaction evidence an official decision by Dean Love, Loyola's Title IX coordinator, and other high-ranking University officials, not to remedy Loyola's systemic mishandling and underreporting of sexual violence.

---

[17] The Tenth Circuit has concluded that Title IX liability exists "when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007).

*See also Posso v. Niagara Univ.*, No. 19-CV-1293-LJV-MJR, 2020 WL 8771334, at *6 (W.D.N.Y. Nov. 2, 2020), report and recommendation adopted, 518 F. Supp. 3d 688 (W.D.N.Y. 2021) (the Court finds *Simpson* and *Karasek* [cited *supra,* in Footnote 3] persuasive for the premise that a university can certainly be liable under Title IX for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context, and possibly beyond that).

259.     In sum, Plaintiffs have stated pre-assault claims by alleging that Loyola adopted a policy of deliberate indifference that subjected students to a heightened risk of being sexually assaulted.

260.     As a result of Loyola's pre-assault discrimination and deliberate indifference, Plaintiffs are entitled to recover their damages and reasonable attorneys' fees and costs of litigation from the University.

### SECOND CAUSE OF ACTION
### VIOLATION OF TITLE IX ("POST-ASSAULT")
*[Against Defendant Loyola University Chicago on behalf of Plaintiffs Kane, Sepulveda, Aragon, Jane Doe B, and Jane Doe M]*

261.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

262.     In violation of federal and state regulations as well as in violation of Loyola's own policies and procedures, the University failed to provide Plaintiffs Kane, Sepulveda, Aragon, Jane Doe B, and Jane Doe M with fair, prompt, and equitable proceedings in response to complaints of sexual misconduct.

263.     Plaintiffs Kane, Sepulveda, Aragon, Jane Doe B, and Jane Doe M allege that the university was deliberately indifferent to their reports of sexual assault because it failed to take disciplinary action, delayed or mishandled their investigations, failed to inform them of resources, and forced them to come into further contact with their harassers.

264.     Resultantly, Plaintiffs Kane, Sepulveda, Aragon, Jane Doe B, and Jane Doe M were subjected to erroneous outcomes: Kane's assailant was erroneously found not guilty, despite overwhelming evidence surpassing the University's preponderance standard; Aragon's assailant was erroneously found not guilty, despite overwhelming evidence surpassing the University's preponderance standard, and Aragon was retaliated against and unjustly reprimanded by Loyola for shedding light on this thereafter; Sepulveda's assailant was erroneously allowed to graduate and received no effective sanction, despite being found guilty of sexual violence; Jane Doe B's

assailant was erroneously found not guilty, despite overwhelming evidence surpassing the University's preponderance standard, and received no effective sanction, being allowed to finish his academic year at Loyola and transfer to another institution thereafter; and Jane Doe M's assailant received no effective sanction, despite being found guilty of sexual violence and was allowed to finish his academic year at Loyola and transfer to another institution thereafter.

265.    Following Plaintiffs' sexual assaults described above, Dean Love and other high-ranking University administrators became aware of the facts underlying their injuries.

266.    In spite of that knowledge, Dean Love and other University officials, with authority to take corrective action on Plaintiffs' behalf, had actual notice of said discrimination and failed to adequately respond. Those failures amounted to deliberate indifference toward the unlawful conduct that was occurring and staggering number of incidents of sexual assault and sexual harassment occurring on Loyola's campus and within non-campus properties and buildings—especially fraternity houses.

267.    The University's response to Plaintiffs Kane, Sepulveda, Aragon, Jane Doe M, and Jane Doe B was so hostile as to compound their injuries.

268.    Loyola's well-documented pattern of discrimination and sexual misconduct against female victims and in favor of male assailants, created an atmosphere on campus that was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of the education and create a sexually hostile environment for Plaintiffs.

269.    Additionally, and/or in the alternative, Loyola failed to enact and/or disseminate and/or implement proper or adequate policies to discover, prohibit or remedy the kind of discrimination that Plaintiffs suffered. This failure included, without limitation, nonexistent and inadequate enforcement policies and procedures for the recognition, reporting, investigation, and correction

of unlawful discrimination. Loyola acted with deliberate indifference in deviating significantly from the standard of care it owed Plaintiffs.

270.    As a result of Loyola's post-assault discrimination and deliberate indifference, Plaintiffs Kane, Sepulveda, Aragon, Jane Doe M, and Jane Doe B are entitled to recover their damages and reasonable attorneys' fees and costs of litigation from the University.

## THIRD CAUSE OF ACTION
## VIOLATION OF ILLINOIS PSVHEA [18]

*[Against Defendant Loyola University Chicago on behalf of Plaintiffs Kane, Sepulveda, Aragon, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe G, Jane Doe B, and Jane Doe M]*

271.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

272.    The University violated the rights of Plaintiffs Kane, Sepulveda, Aragon, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe G, Jane Doe B, and Jane Doe M pursuant to the Illinois Preventing Sexual Violence in Higher Education Act.

273.    Based on information and belief, Loyola's Title IX coordinator, Dean Love, and other high-ranking officials, consciously and intentionally underreported the number of sexually violent incidents that occurred "on campus," in "non-campus buildings or properties," and on "public property" within a reasonably contiguous area of the school, in violation of the Illinois Preventing Sexual Violence in Higher Education's reporting requirements.

274.    Further, Loyola violated the Act by:

---

[18] Because the PSVHEA was enacted in 2015, this cause of action is brought on behalf of Plaintiffs Kane, Sepulveda, Aragon, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe G, Jane Doe B, and Jane Doe M only. Plaintiffs respectfully ask the Court to reconsider its prior Order (dkt. # 57) dismissing this claim for the following reasons: (1) nine Plaintiffs now state this cause of action versus the one plaintiff in *O'Shea v. Augustana Coll.*, 593 F. Supp. 3d 838, 853 (C.D. Ill. 2022); (2) Defendant argues Plaintiffs are not entitled to emotional distress damages pursuant to Title IX—which Plaintiffs Kane, Sepulveda, Aragon, Jane Doe N, Jane Doe A, Jane Doe H, Jane Doe G, Jane Doe B, and Jane Doe M would be entitled to pursuant to the PSVHEA; and (3) whether Plaintiffs state a cause of action pursuant to Title IX and the PSVHEA turn on very similar questions of law and fact.

- Failing to notify Plaintiffs about the protections the University could provide to ensure their safety, such as obtaining an order of protection, changing class schedules or campus housing, reporting to law enforcement, and the availability of medical and counseling services;

- not responding to Madeline's electronically submitted report within 12 hours; Loyola's Title IX Coordinator, Dean Love, has stated although the University is legally obligated to do so, Loyola has its own internal policy of attempting to respond to survivors' electronically submitted reports within one business day; and

- not conducting a prompt, fair, and equitable investigation into Plaintiffs' grievances.

275. While there is not an explicit private right of action in 110 ILCS 155/20, there is an implied right of action that can be established under Illinois common law. *See Metzger v. DaRosa*, 209 Ill. 2d 30, 36 (2004).

276. More specifically, "implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Id.*

277. Plaintiffs, as female students and sexual assault victims at a place of higher education, are members of the class for whose benefit 110 ILCS 155/20 was enacted, and their injuries are that 110 ILCS 155/20 was designed to prevent.

278. A private right of action is consistent with the purpose of the statute, which is to prevent sexual violence in institutions of higher education in the state of Illinois—such as Loyola.

279. Implying a private right of action is necessary to provide an adequate remedy for violations of 110 ILCS 155/20.

280.    As a result of the University's failures and inaction, Plaintiffs have suffered physical damages and mental anguish, among other harms, as a direct and proximate result of Loyola's violations of the Preventing Sexual Violence in Higher Education Act.

## PRAYER FOR RELIEF AND JURY DEMAND

281.    Wherefore, based on the foregoing causes of action, Plaintiffs demand judgment against Loyola in an amount to fully and fairly compensate Plaintiffs for their injuries; together with litigation costs, expenses and reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiffs may be justly entitled.

282.    In addition to monetary damages, Kane, Jane Doe A, Jane Doe H, Jane Doe G, and Aragon were enrolled as Loyola students when they first filed suit; as such, they seek injunctive relief from Loyola, as damages alone are not an adequate remedy for the University's ongoing and continuous violations of federal and state regulations in addition to Loyola's own policies and procedures. Loyola's deliberate indifference to sexual misconduct continues to endanger Loyola students, including Plaintiffs, at present and indefinitely into the future; Dean Love and Loyola's other high-ranking officials know, or reasonably should know, the ongoing and endemic student-on-student sexual assault and sexual harassment has created a hostile environment that pervades to date and will continue unless this court intervenes. Plaintiffs, therefore, seek a permanent injunction requiring Loyola to ensure the University accurately reports incidents of sexual violence; takes substantial steps to properly and timely investigate reports of discrimination at Loyola; provide appropriate interim measures and reasonable accommodations to complainants, impose appropriate discipline and remedial measures in situations where a violation of Title IX is found

to have occurred; cease all retaliatory action against students who report incidents of sexual misconduct; and impose appropriate discipline and remedial measures, as necessary.

283. Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 20, 2025

Respectfully Submitted,

*/s/ Ashley M. Pileika*

Ashley M. Pileika
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
Tel: 214-346-5355
Fax: 214-346-5909
ashley@darrenwolf.com

Elizabeth A. Fegan
**Fegan Scott LLC**
150 S. Wacker Dr., 24th Floor
Chicago, Illinois 60606
Tel: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Joel Wertheimer
**Wertheimer LLC**
14 Wall St, Suite 1603
New York, NY 10005
Tel: 646.720.1098
joel@joelwertheimer.com

*Attorneys for Plaintiffs Madeline Kane, Catherine Ann Cappello, Marissa Sepulveda, Amma Appiagyei-Dankah, Jane Doe A, Jane Doe C, Jane Doe H, Jane Doe G, Jane Doe N, Fernanda Aragon, Jane Doe M, and Jane Doe M*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2025 a true and correct copy of PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT was served on all parties in accordance with the Federal Rules of Civil Procedure.

*/s/ Ashley M. Pileika*

Ashley M. Pileika